STATE *vs.* HOWARD NORMAN PRESCOTT

NOVEMBER 24, 1944.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

CONDON, J. Defendant was indicted for the murder of Avis Macomber at Newport, Rhode Island, on January 31, 1943 and was convicted by a jury in the superior court for the county of Newport, on March 19, 1943, of murder in the second degree. Thereafter he moved in that court for a new trial, which motion was heard and denied on April 1, 1943. Defendant duly excepted to such denial and prosecuted to this court a bill of exceptions setting out that exception and twenty-three others to rulings of the trial justice admitting and excluding evidence and to several portions of his charge to the jury.

In his brief defendant expressly waived exceptions 3, 7, 8, 9, 11, 12, 13, 15, 16 and 24. He argued his·other exceptions at a hearing in this court on October 2, 1944. We shall discuss these exceptions in the order in which he argued and briefed them, that is, the exceptions to the admission or exclusion of evidence, then the exceptions to the charge and, finally, the exception to the denial of his motion for a new trial.

Before proceeding with that discussion it may be helpful first to set out the main facts which caused the state to charge the defendant with murder. It appears from the evidence that on January 31, 1943, at about 8:30 p. m., Mrs. Ellen M. Wright of 227 Park Holm in the city of Newport telephoned to the Newport police station asking that an officer be sent to her home to investigate two shots that she had just heard fired in one of her bedrooms, which was

then occupied by defendant and, as she supposed, his wife, but who was later identified by defendant as Mrs. Avis Macomber.

Within ten minutes thereafter Sergeant Downing and Officer Walsh of the Newport police department arrived at the house and were met by Mrs. Wright, who showed them the bedroom from which she had heard the shots. Downing opened the door of the bedroom and went in, followed by Walsh. As they entered they saw the defendant lying on his back on a bed. His feet were hanging over the foot of the bed and his eyes were closed. He was dressed in the uniform of the United States Army and one lapel of his coat was blown off. Yet there was no blood on him and he was uninjured. On a couch near the bed they saw a young girl, later identified, as stated above, as Mrs. Avis Macomber, lying on her back with her eyes wide open. There was a large hole in her head from which her brains were hanging out, and parts of them were spattered along the wall of the room almost to the ceiling. Between the bed and the couch lay a rifle or shotgun with its butt end toward the bed and its barrel pointed toward the bedroom door. There was a bullet hole in the ceiling.

Officer Walsh felt under defendant's coat and found that his heart was beating. He and Downing then shook defendant and thereupon he opened his eyes and sat up on the bed. He appeared to Downing to be sobbing or crying. No questions were then asked him, but, according to Downing, defendant said: "I did it." He then stood up, lit a cigarette, and also said: "I did it, I will take the blame." Later he further said: "I did it, it is my fault, I wish I was with her."

Almost immediately after Mrs. Wright telephoned for the police, and before they arrived, the defendant called Mrs. Wright into the bedroom. When she entered, the first thing she saw was Avis, whom she knew as the wife of the defendant, lying on her back on the couch. Defendant, who was lying on his back on the bed with his legs hanging

over the foot of it, asked: "Is she gone?", and Mrs. Wright replied: "She is dead." Then the defendant said: "I don't know why she did it." Mrs. Wright replied: "Well, you ought to", and then left the room, closed the door and called the police station a second time, stating that one of the persons in the bedroom was dead.

Apparently in response to that call, Inspector Connolly of the Newport police department arrived at the Wright home at about 8:50 p. m., and took over the investigation. Defendant was then in the bedroom, sitting on the edge of the bed with Sergeant Downing standing beside him. The body of the deceased was still on the couch in the position described by Downing, Walsh and Mrs. Wright. Connolly asked the defendant what happened and he replied: "I did it, I killed her." The inspector then asked how it happened and the defendant answered: "Take me out of this room and I will tell you all." In response to this request defendant was taken to another bedroom, where he told the inspector that he and Avis Macomber had quarreled over his going back that night to Camp Edwards and that finally he put two "slugs" in the gun, one for himself and one for her; that he then shot Avis and had tried to shoot himself, but the second bullet went through the ceiling.

While the investigation was in progress the district medical examiner, Dr. Ciarla, was sent for and he arrived at about 9:15 p. m. He gave the body of the deceased a superficial examination and then ordered it taken to the morgue, where he performed an autopsy. In his examination at the house, however, he found a bullet embedded in the comforter under the deceased's head. This was later admitted as an exhibit at the trial.

Defendant was taken to the police station, where he was further examined by Inspector Connolly sometime after midnight. There he was asked in detail about his relations with the deceased, especially during the day and in the bedroom in the evening just before the shooting. Defendant answered fully, stating that Avis Macomber was a mar-

ried woman, separated from her husband; that he was a married man with a wife and two children living in Dexter, Maine; that he had been living with the deceased for some time in Newport, as man and wife, before he entered the army and that thereafter he occasionally saw and lived with her when he had leave from camp.

He further told explicitly what led up to the shooting and how he came to do it. He said that he first shot Avis and then attempted to kill himself with a second shot, but it went through the ceiling. His answers were taken down in shorthand by Police Clerk Quinn, who later transcribed them in narrative form substantially as they had been dictated by the defendant to the inspector. This typewritten statement and two carbon copies thereof were then signed and sworn to before Lieutenant Murray of the Newport police department, who was also a notary public, and in the presence of the inspector and Police Clerk Quinn. Before he signed, defendant was given about fifteen minutes within which to read the statement and was then asked if he was willing to sign, and he said he was. According to the police officers no force was used and no threats or promises were made to induce him to make the statement or to sign and swear to it. Such statement, over defendant's objection, was admitted in evidence as an exhibit.

Defendant repudiated this statement at the trial and denied that he had ever made any admission at Mrs. Wright's house to her or to any police officer that he had killed Avis Macomber. On the contrary, he testified that she had attempted to shoot him and that, in attempting to take the gun from her, a shot was fired and he thereupon was so dazed that he remembered nothing that happened thereafter until he was handcuffed and taken out of the house by the police. He remembered hearing one of the officers comment at that time on the heavy snow that was falling or had fallen. This was the first thing, after the shot had been fired, that he remembered. He remembered nothing of any conversation with Mrs. Wright or with any

police officer in her house. That was substantially his whole defense.

Under exception 1 defendant contends that he had the right in cross-examination of the state's first witness, Sergeant Downing, to inquire: "Let me ask you this, was he conscious when you first came into the room?" He urges that such a question was proper, because the physical and mental condition of a defendant immediately following the commission of an alleged crime is relevant and has a definite bearing upon one of the elements of the crime with which he is charged.

It is true that an ordinary observer who has enjoyed suitable opportunities for observation may state an inference as to whether a given individual was conscious or unconscious, but it is also well recognized that a witness who is not an expert will not be permitted to give such an opinion until he has first stated the facts upon which he bases his inference. *Pennsylvania Co.* v. *Newmeyer,* 129 Ind. 401. Chamberlayne's Handbook on Evidence, §701. Defendant did not lay any such foundation for his question and it was, therefore, correctly excluded.

Under exception 14 defendant contends that the trial justice erred in permitting the state to ask, in cross-examination of the defendant: "Will you answer my question; were you conscious or unconscious?" Previously he had testified in direct examination that he had no recollection of what happened after the first shot and no idea whether he was conscious or unconscious. Defendant apparently concedes that a witness may be permitted to testify as to his own state of consciousness or unconsciousness and there is no question that such is the accepted rule. 3 Chamberlayne on Evidence, §1898.

But defendant nevertheless argues that the question was improper in view of the fact that he had already "testified that he had no recollection of anything that happened between the time of the first shot and the time the police put the handcuffs on him" and "had no idea whether he

was conscious or unconscious." We see no impropriety. This was cross-examination and its purpose apparently was to test defendant's credibility on the matter of his real state of mind immediately after the first shot. Because he had testified in direct examination that he had no idea whether he was conscious or unconscious did not necessarily preclude the state from cross-examining on this point. Whether or not he really knew what he was doing at that particular time and was aware of what resulted from that first shot were important questions and the state was entitled to considerable latitude in its cross-examination of the defendant thereon, especially in view of the theory of his defense that he did not know anything about how the deceased was killed, although he alone was in the room with her.

In cross-examining Sergeant Downing on the matter of defendant's sobriety during the day and evening of January 31, 1943, counsel for defendant asked: "You weren't too careful in your examination of the defendant, were you?" On the state's objection the question was not answered. Under exception 2 defendant argues that this was error. Such contention is clearly without merit. The question is argumentative and calls for the witness's judgment on his own actions in investigating the defendant's capacity to commit the murder of the deceased.

Defendant's exception 4 is to the exclusion of the following question addressed to Inspector Connolly in cross-examination: "Is it a fair statement for me to say this from your testimony, that although you didn't tell the subject matter of this that it was written there and he should have read it?" Such question, to say the least, is obscure. Obviously, it is an attempt to summarize in a sentence some previous testimony of the witness and elicit from him an interpretation of such testimony. Clearly defendant could not extend cross-examination to that limit. The testimony of a witness must speak for itself. If it does not, the cross-examiner may inquire further to clear

away any ambiguity, but this should be done by further interrogation as to facts and not to the witness's interpretation of his previous testimony. If from any point of view the question was proper, the defendant was not prejudiced by its exclusion at this point when, in the absence of the jury, the trial justice was merely hearing testimony preliminary to deciding whether to permit defendant's purported written confession to go to the jury, because later, in the presence of the jury, his attorney was allowed to go thoroughly into the manner in which such confession was prepared and into what was said in presenting it to him for his signature and oath.

Defendant's exception 5 is to the admission in evidence as an exhibit of the above-mentioned signed and sworn statement. The statement covers several typewritten pages and, as was stated earlier in this opinion, it recounts the relations of defendant with the deceased and the events leading up to the shooting on the evening of January 31, 1943. It clearly contains a confession by the defendant that he intended to kill both himself and the deceased and that he did actually shoot and kill the deceased. We have carefully read the evidence concerning the preparation of this confession and the signing of it by the defendant and we are definitely of the opinion that it was not induced by any force, threats or promises. We are satisfied from the evidence that defendant knew what he was doing when he gave the information at the police station; that the substance of such information was incorporated in the typewritten statement; and that defendant had a fair opportunity to read it before signing it and that to obtain his signature there was no use of threats or promises or force.

We cannot agree with defendant's contention that the statement was merely Inspector Connolly's recollection of what defendant had told him. It seems to us that it is clear from the evidence that the statement is a faithful reproduction of the substance of the defendant's answers to the inspector's questions, as the police clerk recorded them in

shorthand, varying only in its form as a connected narrative rather than as a verbatim report of each question and answer. As such a faithful reproduction the trial justice was correct in admitting it and leaving the determination of its character as a confession, as well as its weight, to the jury. *State* v. *Brown*, 50 R. I. 171.

Under exception 6 defendant contends that the trial justice erred in not granting his motion to strike out Inspector Connolly's testimony of certain measurements which he had made at the time of his investigation at Mrs. Wright's house and which he had entered in a book referred to by him in his direct examination when testifying to such measurements. The book was not introduced in evidence. In cross-examination the inspector admitted that he was reading from the book and was not giving his recollection of the measurements. The ground of defendant's motion to strike was that this cross-examination showed that the witness had not used the book to refresh his recollection, but, having no present recollection at all of such measurements, had merely read the figures that appeared in the book. This, defendant contends, clearly violates well-established rules governing the use and also the scope of the use of written memoranda to refresh the memory of a witness.

The state argues that the objection came too late after the witness had, to the knowledge of the defendant and without objection, openly used the book in testifying in direct examination. We cannot agree with that contention. The defendant was entitled to inquire on cross-examination as to the extent of the witness's reliance upon the book. If the witness was using it merely to refresh a present recollection of the details of those measurements, he was entitled to do so. If, however, it appeared that after looking at the book he had no present recollection of the data therein, he would be permitted to use the book only on condition that he could testify that the data in the book were recorded at a time when they were fairly fresh in his memory and that

at such time he knew them to be accurate, even though he had on the witness stand no present recollection of their accuracy. The testimony shows that the witness was undertaking to testify to measurements which he had taken and correctly recorded on the night of January 31, 1943 but which, on the witness stand, he could not presently recollect. In the circumstances the trial justice did not err in refusing to strike out such testimony, as it was clearly admissible under the law in this state. *State* v. *Colwell,* 3 R. I. 132; *Welch & Co.* v. *Greene,* 24 R. I. 515; *Sak* v. *Pytel,* 46 R. I. 380.

The next exception argued and briefed by defendant is exception 10 to the overruling of his objection to the trial justice's ruling permitting the medical examiner to testify, in answer to the following question: "Doctor, would those injuries be consistent with an instrument such as State's Exhibit No. 17 entering and passing through the head of Avis Macomber?" The instrument referred to was the bullet that the witness had found embedded in the comforter on the couch under the deceased's head. Defendant contends that this was an attempt to elicit opinion evidence without first qualifying the witness as one experienced in the use of firearms and conversant with the effect upon the human body of missiles fired therefrom. The general rule against admitting mere opinion as evidence without first establishing the experiental qualifications of the witness is a sound one where the occasion reasonably calls for its application, but in this state, unless the trial justice is grossly and palpably wrong in admitting such evidence, his ruling will not be reversed by this court. *Eastman* v. *Dunn,* 34 R. I. 416, 456. In the present instance it appears, from the witness's answers to the question objected to and to other questions asked prior thereto without objection, that he was possessed of some knowledge of the effects upon the human anatomy of bullets fired from a gun. We are, therefore, of the opinion that the ruling of the trial justice was

not palpably and grossly wrong and hence should not be reversed.

Defendant objected to the state asking in cross-examination of him: "Mr. Prescott, did you ever tell the police that you didn't remember anything from the time that you heard the first shot up until you were handcuffed?" Under exception 17 defendant simply contends that the question was unfair. We think there is no merit in that contention. It was fair cross-examination. Defendant had already testified, apparently in order to avoid the damaging effect of admissions made by him before he was taken from Mrs. Wright's house by the police, that he did not remember anything after the first shot until he was handcuffed and taken out of the house. Whether or not he ever, at any time, told that story to the police was proper information for the jury to have in weighing his testimony as to his mental awareness after he heard the first shot and also in passing upon his credibility in that regard.

The next five exceptions, 19, 20, 21, 22 and 23, are to various portions of the trial justice's charge to the jury. Under exception 19 the defendant contends that it was error to charge with reference to defendant's alleged confession: "But on the other hand if you find that he made that statement, and that he made it freely of his own volition and not because of threats or promises or inducements, then you have the right and you ought to consider that statement as any other evidence in the case." Defendant argues that this part of the charge unfairly stressed a particular piece of evidence against him.

There is no merit in such contention. On the contrary, we think the jury was, in effect, told that, if they found that the alleged confession was obtained in accordance with the conditions set out, it was not only their right but their duty to place it in the scales and weigh it as they did all other evidence. In other words, the trial justice did not undertake to instruct them that a confession was a special kind of evidence having greater or less strength than other

evidence; but he left it for them to consider, and to give it such weight as they found it deserved. Defendant, in our opinion, puts too much stress on the trial justice's use of the word "ought". In the context in which it appears it could not have prejudiced the defendant, because it imports an obligation on the jury merely to consider the confession with the other evidence in the case. As such, it was a correct statement of law.

Exception 20 is to the following portion of the charge: "There is no evidence here from which you could find that this defendant was in that state (intoxicated). Hence he is to be considered by you as a sober man at the time of the occurrence with which we are interested." Defendant has here culled from the charge an isolated sentence that does not give an adequate idea of the trial justice's instruction to the jury on this point and argues that the state referred to was mere intoxication. The instruction in its entirety reads as follows: "The defendant has told you of his use of intoxicating liquor on the day in question, and the nature and the extent of his drinking. He has also told you that on that evening he was able to think and know whereof he thought; he has told you he was able to speak and know whereof he spoke and that he was able to concentrate. Other witnesses who were inquired of have informed you that as to sobriety he was all right. It is only when drunkenness is of such degree as to completely paralyze the will of the defendant, take from him the power to withstand evil impulses and render his mind incapable of having any sane design that drunkenness may be considered as a defense, and then only to the limited extent of negativing the specific intent charged, if a specific intent is charged as an element of the offense. There is no evidence here from which you could find that this defendant was in that state. Hence he is to be considered by you as a sober man at the time of the occurrence with which we are interested. . . . "

The quotation in itself would seem to sufficiently show that this exception is without merit. We have carefully

read the transcript and we find that there is no evidence that defendant was in any such state of intoxication as specified in the charge. Therefore, the trial justice did not invade the jury's province in telling them that, from the record, defendant was to be considered a sober man.

Under exception 21 defendant argues that it was error for the trial justice to read to the jury the statutory definition of murder in the first degree, because such definition embraced or referred to a manner or method of homicide in certain instances to which the evidence in the case at bar could have no possible relation. He argues that a charge must be applicable to the facts in evidence and cites *State v. Saccoccio,* 50 R. I. 356, 362. That is true, but, on review, where it appears that the verdict clearly shows that the jury did not rely upon any reference in the statutory definition to modes of homicide not related to the evidence before them, it cannot be successfully argued that the defendant suffered any prejudice by the trial justice's reading to them the statutory definition. Here the verdict was second degree murder, showing that the jury rejected in the defendant's favor any view of the evidence that would be consistent with any mode of homicide set out in the statutory definition of murder in the first degree. Moreover, a careful reading of the charge as a whole leaves no room for doubt that the jury were given clear and correct instructions on the nature and kind of a homicide amounting to murder. We are of the opinion, therfore, that the defendant clearly could not have been prejudiced by such charge.

Among correct instructions on murder in the second degree the trial justice also charged as follows: "Murder in the second degree is where there is no premeditation or deliberation, or else if there were premeditation or deliberation it existed in the mind of the accused for only a barely appreciable length of time. That is, it had only a momentary existence." Defendant objected to the first clause on the ground that it is a positive misstatement of the law,

and he has pressed that objection here under exception 22. He contends that premeditation is an essential element of murder under our statute, as it was at common law, and that in this respect murder in the second degree differs from murder in the first degree only in the duration of such premeditation. In answer to this contention the state cites a number of cases from other jurisdictions where it has been held, or where in some instances the court has said, that the distinguishing feature of murder in the second degree is the absence of deliberation and premeditation; and also contends that in any event the whole charge on this point was beneficial rather than prejudicial to the defendant.

We have examined those cases and it is not clear in some of them just what the statute involved requires; in other cases the court seems to say quite clearly that premeditation is not necessary to murder in the second degree. We have not cited those cases here because we are satisfied that there is nothing in our statute which would warrant the statement that murder in the second degree is "where there is no premeditation." On the contrary, we agree with the defendant that, under our law, a homicide to be murder must not be lacking in premeditation. If the premeditation be only momentary, it is sufficient to constitute murder under our statute, just as it was sufficient at common law, the difference now being that a homicide will not amount to murder in the first degree, unless it be perpetrated in the manner defined in the statute to constitute first degree murder. In other words, the statute does not change the common-law crime but merely divides it into two degrees, depending upon the circumstances under which it was committed. *State* v. *Hathaway,* 52 R. I. 492.

The trial justice, perhaps inadvertently, did not correctly state the law in the particular clause objected to by the defendant. However, in reading all of his charge on this very point, it clearly appears that he did correctly charge

them that: "The distinction between the two degrees of murder consists in the extent or amount of premeditation." Substantially the same statement appears elsewhere in the charge. Furthermore, it does not appear in the charge that the jury were told that, if they found that the killing of Avis Macomber was without premeditation, they could nevertheless find defendant guilty of murder in the second degree.

On the contrary, they were distinctly told that malice aforethought was necessary to make her killing murder, either in the first or second degree, as is clearly shown by the following portion of the charge, which portion was given to the jury almost immediately after the portion above quoted upon which the defendant bases exception 22: "If you find, ladies and gentlemen, that the State has proved beyond a reasonable doubt that this defendant did unlawfully kill Avis Macomber with malice aforethought he is guilty of murder, and you will return a verdict that he is guilty of murder in either the first or second degree, as you find the case to be. If you find that the State has failed to prove beyond a reasonable doubt that this defendant did unlawfully kill Avis Macomber with malice aforethought then the State has failed to prove him guilty of murder and you will return a verdict that he is not guilty."

We are of the opinion, therefore, that the jury, after listening to the whole charge on this point, could not have been confused about the necessity for the existence of some premeditation, that is, malice aforethought on the part of the defendant, in order to convict him of murder in the second degree. We are also of the opinion that, taken as a whole, the charge did make sufficiently clear to the jury that an indispensable requisite to proof of the crime of murder in the second degree was premeditation, though it need not be more than momentary. In other words, whatever error there was in the isolated statement which was objected to was cured by the trial justice's correct statements of the law on this point and his illustration of how

the jury should apply it to the evidence connecting the defendant with the death of the deceased.

Under his exception 23 defendant complains of the refusal of the trial justice to charge the jury on manslaughter. There is no merit in this exception. Only where there is evidence upon which a finding of a lower degree of homicide than that charged could have been based is it error not to charge the jury on such lower offense. *State* v. *Saccoccio, supra; State* v. *Hathaway, supra.* Here there was no such evidence. Rather on the evidence, as we view it, defendant was guilty of murder in either the first or second degree or he was not guilty. Neither on the state's theory of the killing nor on the defendant's, nor on any other theory reasonably inferable from all the evidence, was it possible in our opinion to reach an explanation of this homicide in terms of manslaughter.

We now come to defendant's exception 18 to the denial of his motion for a new trial. In considering this exception we are bound, as in civil cases, by the rule that the decision of the trial justice should not be disturbed unless it is clearly wrong. *State* v. *Di Noi,* 59 R. I. 348; *State* v. *Badnelley,* 32 R. I. 378. The trial justice, in his decision denying the defendant's motion, has strongly approved the jury's verdict and has given clear and cogent reasons for such decision. After carefully reading the transcript we are of the opinion that he was justified in doing so and, therefore, we cannot say that his decision was clearly wrong.

All of the defendant's exceptions having been found to be without merit, they are overruled, and the case is remitted to the superior court for further proceedings.

*John H. Nolan,* Attorney General, *John O. Pastore,* Assistant Attorney General, *John J. Cooney,* for State.

*Benjamin Cianciarulo,* Public Defender, *Aram A. Arabian,* for defendant.