**STATE**

v.

**Sidney CLARK.**

**No. 76–440–C.A.**

Supreme Court of Rhode Island.

Dec. 8, 1980.

Reargument Denied Jan. 5, 1981.

Dennis J. Roberts, II, Atty. Gen., Barry N. Capalbo, Thomas H. Caruolo, Sp. Asst. Attys. Gen., for plaintiff.

William F. Reilly, Public Defender, Barbara Hurst, Chief Appellate Atty., John A. MacFadyen, III, Asst. Public Defender, for defendant.

## OPINION

KELLEHER, Justice.

This indictment charges the defendant, Sidney Clark (Clark), and two others with the murder of Claude Saunders (Saunders). The charges arose from the November 2, 1974 stabbing death of Saunders at a time when the deceased and the defendant were incarcerated at the Adult Correctional Institutions (ACI). On September 11, 1975, the state filed a motion requesting that each defendant be tried separately. The motion was granted, and in late October 1975 a Superior Court jury found the defendant guilty of second-degree murder. Subsequently, the trial justice, acting pursuant to what he believed was the mandate of G.L. 1956 (1969 Reenactment) § 11–23–2, as amended by P.L. 1973, ch. 280, § 1, imposed the death sentence. Later, on February 19, 1979, this court ruled that the mandatory death provisions of § 11–23–2 violated the constitutional guarantee against cruel and unusual punishment. *State v. Cline*, R.I., 397 A.2d 1309 (1979). Subsequently, Clark was returned to the Superior Court for resentencing, and on October 9, 1979, he received a life sentence.

Saunders was stabbed at approximately 5 p. m. while he was sitting in his cell. Within minutes of the stabbing, the State Police were at the prison, and the investigation began. One officer who viewed Saunders's cell noted that there was "blood all over the place." The police received statements from various prisoners indicating, in essence, that Clark had entered Saunders's cell and stabbed him. Some of the correctional officers who were on duty in the cell area conceded that they did not observe Clark near the scene of the murder but acknowledged that their attention was directed toward aiding the deceased. During the investigation the State Police noticed that a ceiling tile was out of place. Upon lifting the tile, they found a white towel; wrapped within the towel was a knife that was subsequently identified as the possible murder weapon. As a result of the investigation, the police charged Clark and two other inmates, Jesse Cannon (Cannon) and Tyrone Powell (Powell), with murder.

Clark is before us on an appeal in which he raises a plethora of issues. We shall limit our discussion solely to those issues that merit consideration.

Clark argues that the trial justice abused his discretion when he granted the state's motion to sever his trial from that of

his codefendants. We disagree. Although a severance at the state's insistence may be a unique event—usually it is the defendant who seeks such relief—the relief sought was available pursuant to the language of Super.R.Crim.P. 14, which in its pertinent portion provides that if "it appears that a defendant or the state is prejudiced by a joinder of * * * defendants in an indictment * * * or by such joinder for trial together, the court may * * * grant a severance of defendants or provide whatever other relief justice requires." Under Rule 14 the touchstone for the grant of a severance is a showing of "prejudice" to the moving party.

▉ Clark contends that the burden of persuasion should be heavier when the severance is initiated by the state rather than by the defendant. We disagree. Rule 14's relief by its express terms is available to the prosecution as well as to the defense, and as Judge Learned Hand observed, "No accused person has any recognizable legal interest in being tried with another, accused with him, though he often has an interest in not being so tried * * *." *United States v. Bronson*, 145 F.2d 939, 943 (2d Cir. 1944).

The basis for the state's motion was its concern that evidence of Clark's direct participation in the stabbing might "rub off" on Cannon. Concern was also expressed that impeaching evidence available against Powell would be prejudicial to Clark. The prosecutor also pointed out that if one of the accused testified, he would be "forcing the hand" of the other two of his codefendants. The trial justice, in granting the motion, found that a joint trial would prejudice the state in two respects. He believed that there was a "strong possibility" that evidence adduced against one defendant might adversely affect the jury's ability to perceive the guilt or innocence of one or both of the other defendants. He also noted that since the jury was well aware that a guilty verdict against one defendant was

the equivalent of a trip to the gas chamber, a guilty verdict as to all three defendants was well nigh an impossibility.

▉ We cannot fault the trial justice's rationale in finding that the state's interests would be prejudiced by a trial involving all three defendants. Although there may be those who, because of their adherence to the "sporting" theory of litigation, would require the state to live with its original decision to indict all three defendants, there is something more at stake here than a sporting event. Our adversary trial system's goal is to ascertain the truth rather than to select one of the litigants as the winner. Here, the trial justice, in ordering the severance, recognized a legitimate prosecutorial goal. *United States v. Grullon*, 482 F.Supp. 429, 431 (E.D.Pa.1979).

When we consider the disadvantages that may have accrued to Clark by the grant of the severance, we are told of an impairment of trial counsel's ability to prepare his defense adequately and the loss of advantage because the severance left Clark "out on a limb alone" where he could not benefit from any of the weaknesses that might develop in the state's presentation of evidence against Cannon and Powell. Prior to the filing of the severance motion, defendants had agreed to a joint effort in which the various facets of the defense had been allocated to each counsel for the respective defendants. However, the trial justice was aware of this situation, and in the severance order he specifically directed Cannon's counsel to be available and to act as cocounsel along with Clark's trial counsel.[1] Again, the public defender's staff, which was serving Powell's legal needs, continued to provide Clark with investigative support services.

Although Clark may have had to shift gears, the severance award in no way impinged upon his right to a fair trial.

---

1. *The record indicates that, with the exception of three occasions, Cannon's counsel was present throughout the jury-selection process and the trial. Two of his absences occurred during the selection of the jury, and he was* absent for one day of trial. An examination of the record indicates that nothing happened on those occasions which would have necessitated his presence.

Clark's worry about being out on the branch by himself is certainly no defense to the grant of the motion for a severance. Even though a defendant has a right to demonstrate weaknesses in the evidence presented against him, he has no right to avail himself of weaknesses in the testimony relevant to his codefendants but immaterial to him. Rather, his guilt or innocence should be determined solely on the strength of the evidence adduced against him. As implied earlier in this discussion, a motion for severance is directed to the sound judicial discretion of the trial justice, and we see nothing in this record to disturb the choice made by the trial justice.[2]

Clark submits that the trial justice's exclusion of three prospective jurors from the jury impaneled to hear this case violates the principles of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Although this issue may be moot,[3] we find, in any event, that the principles of *Witherspoon* were not violated.

■ Under *Witherspoon*, potential jurors may not constitutionally be excluded for cause "simply because they voiced general objections to the death penalty or expressed conscientious scruples against its infliction." *Id.* at 522, 88 S.Ct. at 1776–77, 20 L.Ed.2d at 784–85. Exclusion of a single individual for such a reason renders the death penalty constitutionally infirm. *Davis v. Georgia*, 429 U.S. 122, 123, 97 S.Ct. 399, 399–400, 50 L.Ed.2d 339, 341 (1976).

"A man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State and can thus obey the oath he takes as a juror. But a jury from which all such men have been excluded cannot perform the task demanded of it * * * in a nation less than half of whose people believe in the death penalty, a jury composed exclusively of such people cannot speak for the community." *Witherspoon v. Illinois*, 391 U.S. at 519–20, 88 S.Ct. at 1775–76, 20 L.Ed.2d at 783.

■ The prosecution does have a right, however, to challenge for cause those prospective jurors who state that their reservations about capital punishment would prevent them from making an impartial decision. *Id.* at 513–14, 88 S.Ct. at 1772–73, 20 L.Ed.2d at 780. The state may insist that jurors determine the facts impartially and apply the law as charged by the court.

Recently, in *Adams v. Texas*, 448 U.S. ——, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), the Supreme Court found a violation of the *Witherspoon* principle. In *Adams*, the state of Texas excluded members of the venire because they were unable to take an oath that the mandatory penalty of death or imprisonment for life would not "affect" their deliberations on any issue of fact. The court emphasized the word "affected." It noted that simply because a juror is "affected" by capital punishment does not mean he is unwilling or unable to follow the court's instructions and obey the oath. *Id.* at ——, 100 S.Ct. at 2528–29, 65 L.Ed.2d at 592–93.

Consequently, the key question to be asked when a trial judge is confronted with a *Witherspoon* situation is this: Can the juror obey his oath in spite of his feelings about capital punishment?

---

**2.** Although the death-penalty provision has been nullified, we have appraised the trial justice's severance grant in the light of the situation then before him. *State v. McLucas*, 172 Conn. 542, 560, 375 A.2d 1014, 1023 (1977).

**3.** In *State v. Cline*, R.I., 405 A.2d 1192, 1201 (1979), we noted that it might well be argued that in a death-penalty case no constitutional challenge can be made concerning the verdict of guilt. *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), held that the death penalty was unconstitutionally applied; the determination of guilt was not dis-

turbed. Clark's case may be different, however. *Witherspoon* involved a bifurcated statutory scheme in which the finding of guilt was clearly separable from the imposition of the death penalty. In contrast, the Rhode Island statute made death the mandatory sentence. The jury's determination of the verdict and the sentence were, in effect, the same. *See also* Oberer, *Does Disqualification of Jurors for Scruples against Capital Punishment Constitute Denial of Fair Trial on Issue of Guilt?* 39 Tex.L.Rev. 545, 556–57 (1951).

Turning to the record, we note the following colloquy with respect to the challenged exclusions:

Ms. North:

"The Court: Knowing that your vote is going to result in the death penalty being imposed on this defendant, would you have any hesitation, in voting in accordance with the law and the evidence?

"The Witness: I don't know.

"The Court: In other words, you don't know whether or not you'd be able to cast your vote for guilty?

"The Witness: If I had the deciding vote, no."

Mrs. Zanni:

"The Court: But could you say he was guilty if you believed he was guilty?

"The Witness: Oh, yes, I could do that, but I don't know. I don't know.

"The Court: Suppose the other eleven have already voted, and they have already voted guilty, and you have already indicated before the vote that you thought he was guilty, and now they say, 'All right, Mrs. Zanni, it is your turn to vote. We need your vote,' and you know that that vote is going to bring about the death penalty through the Court. Do you think you'd be able to say, 'Well, it's my duty and I'm going to vote,' or would you say, 'I can't do it?'

"The Witness: I'd probably say I couldn't do it."

Mrs. Roberts:

"The Witness: See, this whole thing hassles my head, and it's hard for me to say yes definitely if eleven people and the Court has proved him guilty I could say guilty.

"The Court: Mrs. Roberts, is there a possibility now that if you get to a point where your vote is about to be cast and you knew it was going to result in a guilty verdict and it would result in the death penalty being imposed upon this defendant that you would be precluded from casting that vote?

"The Witness: There is a possibility, yes."

■ It is significant that the trial justice did not exclude these jurors simply because of their beliefs concerning capital punishment, see *Witherspoon v. Illinois*, or because they might be "affected" by those beliefs. *See Adams v. Texas*, 448 U.S. ——, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). Rather, he tried to determine whether, in spite of those views, they could follow their oaths. All three potential jurors expressed serious doubts that they could subordinate their views on capital punishment to their duty to decide Clark's fate upon the evidence.

Again, in *Lockett v. Ohio*, 438 U.S. 586, 595–96, 98 S.Ct. 2954, 2960, 57 L.Ed.2d 973, 984 (1978), the Supreme Court upheld the exclusion of several potential jurors who were unable to respond affirmatively to the following inquiry: "Do you feel that you could take an oath to well and truly try this case * * * and follow the law, or is your conviction so strong that you cannot take an oath, knowing that a possibility exists in regard to capital punishment?" Each of the excluded individuals in *Lockett* made it clear that he or she could not be trusted to abide by the existing law and to follow conscientiously the instructions of the trial judge. In light of the foregoing discussion, we believe that here the exclusion of the three potential jurors was justified.

Another claim of error concerns the trial justice's refusal to allow the jury to view various portions of the ACI. Clark contends that the entire thrust of his case was to discredit the testimony of the inmates who testified for the prosecution. According to Clark, the inmates were out to "frame" him and to this end committed perjury. He maintains that crucial to his defense was an ability on the part of the jury to understand fully the physical layout of the cell block and the other prison areas that were referred to by the various witnesses for the prosecution. Had this awareness been present, Clark asserts, the jury would have rejected the testimony offered by the state.

■ The grant or denial of a motion to take a view is a matter within the sound discretion of the trial justice. *State v. Carsetti*, 111 R.I. 642, 306 A.2d 166 (1973); *DiMaio v. DelSesto*, 102 R.I. 116, 228 A.2d 861 (1967).[4] His decision will not be overturned absent a clear showing that he abused his discretion. *State v. Carsetti*, 111 R.I. 642, 306 A.2d 166 (1973); *State v. Smith*, 70 R.I. 500, 41 A.2d 153 (1945). In reference to a jury view, this court has observed, " * * * the trial justice's denial of such a request is rarely if ever open to question." *DiMaio v. DelSesto*, 102 R.I. 116, 120, 228 A.2d 861, 863 (1967).

The trial justice, in his consideration of the motion, attempted to balance the benefits to be gained from the view against the potential for prejudice. In regard to the benefits, he noted that a view would be taken "if confusion became apparent." He had personally taken a view, and this action better prepared him to appraise the necessity of a second undertaking. The jury had the benefit of photographs of the cell-block area where the homicide occurred.

■ The trial justice made it clear that he was hesitant in exposing the jurors to a prison locale. His thinking parallels that of a recent Maine case. *State v. Melvin*, 390 A.2d 1024 (Me.1978).

"Moreover as to any additional assistance the jury might derive from an actual view of the prison, it was reasonable for the presiding justice to have concluded that this benefit was sufficiently minor to be outweighed by the special burdens involved in a jury view of the State Prison: the extraordinary precautions which would be necessary to maintain prison routine and security because of the presence of the jury as well as to ensure that the jury would not become exposed to potentially prejudicial information." *Id.* at 1032.

The trial justice weighed the alternative interests, perceived the potential for preju-

dice, and denied the request. We cannot fault this denial.

Before the commencement of trial, Clark moved to disqualify the prosecutor, and he also asked the trial justice to recuse himself. The basis for the disqualification was the presence at one time on the Attorney General's staff of Walter Stone. Attorney Stone had previously been associated with the public defender. A similar claim concerning Mr. Stone was raised and denied in *State v. Cline*, R.I., 405 A.2d 1192 (1979). As in *Cline*, the record here shows no prejudice to the defendant. *Id.*, 405 A.2d at 1207. There is no suggestion that Mr. Stone imparted knowledge received from his association with Clark to anyone involved in the state's prosecution.

The recusal motion results from the undisputed fact that approximately a year and a half prior to the commencement of the trial the prosecutor had rented office space from a law partnership in which the trial justice was then a member. Shortly thereafter the trial justice withdrew from the practice of law and assumed his present position on May 7, 1974. Clark's appellate counsel argues that the trial justice should have recused himself in order to avoid the appearance of impropriety.

The trial justice acknowledged the tenancy but was totally unaware of the amount of the prosecutor's rent which, he said, was the responsibility of other members of the partnership. As the owner of the building in which the law office was located, he stated that the rentals never exceeded the amount of the expense of maintaining and operating the building. The trial justice described the meetings between himself and the prosecutor as consisting of a "hello" and a "goodbye" exchanged when the two attorneys passed each other while entering and leaving the office building. The prosecutor, who at that time could practice law part-time, had what might be described as a night and weekend law office. No evidence

---

4. General Laws 1956 (1969 Reenactment) § 9-16 1 states,

"*Court order for view*: In all cases in which it shall seem advisable to the court, on re-

quest of either party, a view by the jury may be ordered; and in all such cases the court shall regulate the proceedings at the view and in its discretion accompany the jury."

was ever introduced that the landlord-tenant relationship was still in existence at trial time.

 We are reminded that a judge has as great an obligation not to disqualify himself when there is no occasion to do so as he has to do so when the occasion does arise. *Amidon v. State*, 604 P.2d 575, 577 (Alaska 1979). Feelings of a criminal defendant, which may well be subjective, cannot without more constitute the test for the disqualification of a trial judge. *Wolfson v. Palmieri*, 396 F.2d 121, 125 (2d Cir. 1968). Before a judge is required to recuse in order to avoid the appearance of impropriety, facts must be elicited indicating that it is reasonable for members of the public or a litigant or counsel to question the trial justice's impartiality. However, recusal is not in order by a mere accusation that is totally unsupported by substantial fact. *Marr v. Marr*, 383 So.2d 194, 196 (Ala.Civ.App.1980). Here, at most, the record indicates that the trial justice and the prosecutor were acquaintances. Mere acquaintanceship between members of the bench and bar, particularly in a state the size of Rhode Island, is not a ground for recusal. If it were, the state's judicial system might well grind to a halt. On this record the trial justice's interest in the subject matter of the litigation before him was illusive and his association with the prosecutor insignificant. The rejection of the recusal motion was correct.

 The next facet of Clark's appeal involves the denial of his motion to suppress the results of a benzidine test given him some seven hours after the stabbing. The benzidine test, which is used to detect the presence of blood, was discussed at great length in *State v. Carillo*, R.I., 407 A.2d 491 (1979). Much of what we said in *Carillo* can be repeated here. The motion to suppress was based on Clark's contention that there was no probable cause for his arrest, and he challenged the reliability of the test. As noted earlier, prior to the test the police were in receipt of statements from some of Clark's fellow inmates indicating that he was the one who had entered Saunder's cell and killed him. Consequently, there was

probable cause for the arrest. The officer who administered the test unquestionably possessed the requisite qualifications. Admittedly, the test results are not conclusive, but this factor goes to the weight the test is to be given rather than to its admissibility. The carcinogenic potential of benzidine is not a proper issue for challenge in this appeal.

 Clark did argue at the suppression hearing that he was entitled to the presence of counsel while the test was being administered. However, the Supreme Court in *United States v. Wade*, 388 U.S. 218, 227–28, 87 S.Ct. 1926, 1932–33, 18 L.Ed.2d 1149, 1157–58 (1967), specifically noted that counsel was not required to be present at evidence-gathering procedures such as the scientific analysis of an accused's fingerprints, blood sample, or clothing. The specific ground now urged by Clark was rejected in *United States v. Sheard*, 154 U.S.App.D.C. 9, 473 F.2d 139 (D.C. Cir. 1972), and *United States v. Smith*, 152 U.S.App.D.C. 229, 231, 470 F.2d 377, 379–80 (D.C.Cir.1972). In *Dunn v. Petit*, R.I., 388 A.2d 809, 812 (1978), where the accused claimed a constitutional right to consult with counsel prior to undergoing a breathalyzer test, we subscribed to the sentiments expressed above. Here, in a similar vein, we find that there is no right to counsel before the administration of the benzidine test since cross-examination provides a sufficient safeguard to an accused's right to a fair trial.

One of the inmates who testified for the state was Robert Studman. He stated that he saw Clark, with a knife in hand, enter Saunders's cell and stab its occupant. During cross-examination, Studman was asked why, in the light of what he saw, he failed to alert the correctional officers about what was going on. Studman then made it clear that silence was golden insofar as his relationship with his fellow inmates was concerned, otherwise, "somebody could come to my cell and stick me." When the cross-examiner inquired, "If your cell is locked, no one can get in it, can they?" Studman responded, "There are members of the Afro-American Society. They do whatever

they want in the penitentiary * * *." Later, on redirect examination, the following exchange occurred:

"Q. Mr. Studman, Mr. Sheehan asked you that if Mr. Saunders was a friend of yours and you witnessed Sidney Clark with a knife in his cell, why didn't you go to the correctional officer for help for your friend. Would you tell us why you didn't go?

"A. (cont'd) In the ACI you don't do things like that. You just, you know, you just don't do nothing like that. If I was to say something—if I was to yell, run down to the correctional officer on my way back or wherever I choose to went in the penitentiary, I would get stabbed * * *."

Defense counsel moved to strike this particular response, claiming it had no factual basis but was extremely prejudicial. The court denied the motion. We concur in his denial.

 Studman was testifying to an observable "fact of life" at the ACI, and this type of evidence indicated the possible influence that such a fact of life had upon him. *See State v. Camerlin*, 117 R.I. 61, 67, 362 A.2d 759, 762 (1976). The defense, by its questioning, had placed Studman's silence in issue, and his response, while unexpected, was certainly plausible. This portion of the record is but another example of the point that when one fishes during cross-examination, he may learn that, in playing with fire, one can get burned. *State v. Mastracchio*, 112 R.I. 487, 495, 312 A.2d 190, 195 (1973); *State v. Bruni*, 79 R.I. 311, 317, 88 A.2d 162, 165 (1952).

Clark complains about his inability to show an alleged inconsistency in the testimony of the state's chief medical examiner, Dr. William Q. Sturner. Early in the trial, while testifying as a witness for the prosecution, Dr. Sturner stated that the knife police found behind the ceiling tile could have been the murder weapon. He also explained that as a result of an autopsy it was determined that the fatal wound measured five and a half to six inches in length.

During cross-examination, he agreed that the murder weapon had to be at least five and a half to six inches in length. The pointed portion of the secreted knife measured four inches.

Later in the trial, the defense summoned Dr. Sturner to the stand to ask him if his autopsy indicated a severance of Saunders's pulmonary artery. After the witness had answered in the affirmative, the prosecutor in his cross-examination inquired about the distance between the chest and the pulmonary artery. Doctor Sturner estimated this distance as being approximately four inches. He then went on to explain that even though it was easy to measure the length of the wound, it was another matter to determine the length of the instrument that caused the wound. In fact, Dr. Sturner said, it was possible that the weapon could be shorter than the length of the wound. This possibility resulted from the compressibility of the chest cavity. Doctor Sturner estimated the compressibility factor as being between one-half and one inch.

When Clark's counsel began his further redirect examination, he reminded the physician of his earlier testimony and asked Dr. Sturner if he had already told the jury that the murder weapon had to be at least five and a half to six inches in length. The trial justice, in sustaining the prosecutor's objection to this particular line of inquiry, indicated that there was no change in the witness's testimony.

 Whether a witness has testified inconsistently is a question directed to the trial justice's discretion. *State v. Earley*, 118 R.I. 205, 373 A.2d 162 (1977). In the case at bar, the trial justice first observed that the knife found by the police was not "the typical dagger situation" where there is a guard that would prevent further entry of the blade. The knife that is in evidence is a do-it-yourself product. The metal portion of the knife appears to be a steel bar that measures eight and three-quarters inches in length and one inch in width. As mentioned before, the exposed tapered portion of the bar measures four inches in length. The remaining, or handle, portion

**1160**

of the bar is wrapped with smooth, glossy electrical tape, and, of course, there is no guard separating the blade from the handle.

■ The trial justice made it clear that, in his opinion, the weapon before him from its tip to the top of its handle "could have been pushed right into the body without any question." After examining the alleged weapon, we find the trial justice's reasoning most persuasive. It is clear that at no time did Dr. Sturner say that the weapon now before us was to be considered as consisting solely of four inches of exposed steel.

Clark also complains about various incidents that occurred subsequent to the conclusion of the evidentiary portion of the trial. The significant questions he raises or attempts to raise relate to the prosecutor's argument, the charge to the jury, and an alleged violation of Clark's constitutional right to be present during the entire trial.

At the conclusion of the trial justice's charge, Clark moved to pass the case on the ground of remarks made by the prosecutor during his closing argument. In a portion of his argument, the prosecutor alluded to the defense witnesses presented by Clark and commented, for example: "Not one witness said at 5 o'clock Sidney Clark was in the gym or in the cafeteria. Not one witness said where Sidney Clark was except *for the witnesses who put him in that cell.*" Clark contends that this line of commentary actually constituted a comment upon his privilege against self-incrimination.

■ We have made it perfectly clear that as a general rule a defendant who seeks to preserve a question of prejudicial comment uttered during closing argument must not only make an objection at the time of such remark but also must make a request for a cautionary instruction. *State v. Pailin*, 114 R.I. 725, 728, 339 A.2d 253, 255 (1975); *State v. Plante*, 111 R.I. 386, 302 A.2d 804 (1973). The purpose of this rule is to give the trial justice an opportunity to cure any alleged error by an immediate cautionary instruction. We see nothing in the prosecutor's remarks which would cause us to make an exception to the general rule.

Clark maintains that the trial justice should have charged the jury that it could have returned a verdict finding him guilty of involuntary manslaughter. Such a charge would have been in order if evidence was presented indicating that Claude Saunders's death was the result of an "unintentional killing." *See State v. McVay*, 47 R.I. 292, 295–96, 132 A. 436, 438 (1926).[5] Clark insists that there was such evidence, pointing out that Studman, in describing the prestabbing confrontation between Clark and Saunders, reported that they appeared "ready to fight," and he subsequently explained that when Saunders was getting up from his cot, he "sort of jumped into the shank [knife]." Clark claims the jury could well have believed that the stabbing was accidental because Saunders somehow jumped into the knife.

■ A fair summation of Studman's testimony precludes any inference that Saunders's death was the result of an unintentional stabbing. Studman had stated that Clark entered Saunders's cell with a knife in his hand. Clark swung the knife three times, inflicting two stab wounds. Studman reported that Clark stabbed Saunders "smack in the middle of the chest." Studman also explained that when he said that Saunders had jumped into the knife, he actually meant that the victim was trying to get up from his cot when Clark attacked him with the knife. He made it crystal clear that there was nothing accidental about the stabbing incident.

The defense also relies upon testimony given by Saunders's brother, Charles, who at the time of the homicide was also an inmate at the prison. Charles had testified that earlier in the day of his brother's death Clark had come to his cell and told Charles

---

**5.** In *State v. Vargas*, R.I., 420 A.2d 809, 815 (1980), we defined involuntary manslaughter as an unintentional homicide without malice aforethought, committed either in the performance of an unlawful act not amounting to a felony or in the performance of a lawful act with criminal negligence.

that he was going "to scare" his brother because Claude owed Clark an ounce of marijuana. According to the defense, Clark's scare tactics were sufficient to warrant the involuntary manslaughter charge. However, Charles Saunders made it clear that after Clark had mentioned the scare, Charles told Clark, "Man, you're not going to do nothing to my brother," and Clark responded, "Well, if you want to do anything, you're going to get the tip of this knife too." Clark's threat about the "tip of this knife," Studman's testimony, and the two stab wounds preclude any reasonable inference that the killing was unintentional.

■ Clark also contends that the trial justice erred when in his charge he first defined second-degree murder as "murder without malice aforethought before the commencing of the killing." Earlier, he had defined "malice aforethought" as "an evil design or an intention to kill another human being in the mind of the person doing the killing prior to, or before, the killing." It is well established in this jurisdiction that for a homicide to be classified as murder, there must be shown to have existed an intent on the part of the accused, and we have always stressed that the determinative factor differentiating first-degree from second-degree murder is the time lag between the formation of the homicidal intent and the killing itself. If that intent is more than momentary, the murder is first degree; if the intent had a momentary existence, a finding of murder in the second degree is warranted. *State v. Myers*, 115 R.I. 583, 591, 350 A.2d 611, 615 (1976); *State v. Page*, 104 R.I. 323, 244 A.2d 258 (1968); *State v. Crough*, 89 R.I. 338, 152 A.2d 644 (1959); *State v. Prescott*, 70 R.I. 403, 40 A.2d 721 (1944); *State v. Fenik*, 45 R.I. 309, 121 A. 218 (1923).

■ In considering a challenge to a trial justice's charge, we must view the charge in its entirety. Whereas the trial justice did err when he initially defined second-degree murder, he subsequently defined the difference between these two crimes when he said,

"If there is malice, premeditation and the intention to kill in the mind of the person doing the killing for more than an appreciable length of time, not simply momentary, then it is murder in the first degree. If that malice, premeditation and intention to kill exists in the killer's mind for only a barely appreciable time—seconds, less than momentary—then the killing cannot in law be murder in the first degree, but is instead, murder in the second degree.

"The difference, again, the distinction between the two, is the time, the length of the existence of malice, premeditation and intent to kill in the mind of the killer prior to the killing."

Later the trial justice, in recapitulating the elements of first-degree murder, second-degree murder, and voluntary manslaughter, stated that a return of a second-degree-murder verdict depended upon proof that the intent to kill had an existence spanning a "barely appreciable length of time." We have no doubt that the jury, after listening to the entire charge, was well aware of the elements of second-degree murder.

The trial justice concluded his charge and various housekeeping duties, such as noting objections to the charge and checking the exhibits that were going to be considered by the jury, at 4:05 p. m. on Thursday, October 23, 1975. After time out for dinner, the jury began its deliberations at approximately 8:15 p. m. Almost two hours later the jury returned to the courtroom. It had sent the trial justice a communication that contained requests for the following information: (a) the time when an inmate witness, Vincent Pope (Pope), claimed he saw Clark and Cannon hiding the knife, (b) the time Holley saw Clark and Cannon at the prison's refreshment stand, and (c) the time the guard let Clark into his cell. Thereafter, Pope's testimony concerning the time he saw the knife secreted was read to the jury. The jury was told that Holley was never asked for, nor did he specify, the time he saw Clark and Cannon at the refreshment stand. The jury was also informed that the testimony indicated that Clark entered his cell at about 5:30 p. m.

The deliberations continued on through Friday and Saturday. On Saturday morning, October 25, 1975, the trial justice met in his chambers with the attorneys. The transcript indicates that the trial justice had received a written communication signed by the foreman asking if the jury could be furnished with "a line drawing" of the prison's maximum security section "showing the relationships of the various sections to each other." The record indicates that counsel had agreed that it was not necessary that the jury be brought back into the courtroom or defendant brought up from the cell block, but the sheriff would take the trial justice's written response and deliver it without any explanation whatsoever to the foreman. The note read, "No, you must rely upon the evidence that has been introduced" and was signed by the trial justice. The record indicates that Clark's trial counsel agreed to this procedure.

We have no idea whether Clark was present in the courtroom when the jury first returned on Thursday evening with its three-point inquiry, but we do know that his trial counsel vouched for the accuracy of the trial justice's responses. The record makes it clear that when the request for the line drawing was received, Clark's counsel agreed with the steps taken by the trial justice.

 In *State v. Brown*, R.I., 399 A.2d 1222, 1224 (1979), we acknowledged that a defendant in a criminal trial has a right, under both our Federal and our State Constitutions, to be present at all stages of the trial when his absence might affect the fairness of the proceedings. Rule 43 of the Superior Court Rules of Criminal Procedure, apart from certain specific exceptions, makes it clear that a defendant has a right to be present "at every stage of the trial including the impaneling of the jury and the return of the verdict." Clark also asserts a violation of Super.R.Crim.P. 43. Nevertheless, in the light of the record, we decline to review these claims, having in mind that everything the trial justice did met with the approval of Clark's trial counsel. *State v. Pope*, R.I., 414 A.2d 781 (1980).

The defendant's appeal is denied and dismissed, and the judgment of conviction is affirmed.

DORIS, J., was present at oral argument but did not participate in the decision.