STATE

v.

Gahil OLIVEIRA et al.[1]

No. 99–7–C.A.

Supreme Court of Rhode Island.

July 6, 2001.

---

1. Throughout the record there are various spellings of defendant Oliveira's first name. We chose to adopt the spelling used by his public defender at trial.

Annie Goldberg, Jane Mcsoley, Paul F. Daly, Jr., Aaron L. Weisman, Providence, For Plaintiff.

John A. MacFadyen, III, Vincent A. Indeglia, Paula Rosin, Providence, Damon D'Ambrosio, Pawtucket, For Defendant.

Present: WILLIAMS, C.J., LEDERBERG, BOURCIER, and FLANDERS, JJ.

## OPINION

WILLIAMS, Chief Justice.

This case came before the Court on the appeal of the defendants, Gahil Oliveira (Oliveira), Jason Ferrell (Ferrell), Pedro Sanders (Sanders), and Robert McKinney (McKinney) (collectively referred to as defendants). They were indicted together for first-degree murder, assault with intent to murder, and two counts of conspiracy to commit each crime. They were tried together before two juries in the Superior Court. All four defendants were convicted of the two conspiracies. Oliveira, McKinney, and Sanders also were convicted of first-degree murder and assault with intent to murder. Ferrell was convicted of assault, but acquitted of murder. This appeal followed. We affirm the judgment of the Superior Court. The facts insofar as pertinent to this appeal are as follows.

## FACTS AND TRAVEL

On December 15, 1995, Wayne Baptista (Baptista), known among his friends as Pearl, was shot and killed.[2] Two days later, three of Baptista's closest friends, Oliveira, Ferrell, and McKinney, had their right arms tattooed with the name "Pearl," a cross, the date "12/15/95," and the acronym, "RIP."

The next day, on the morning of December 18, 1995, between 9 a.m. and 10 a.m., Carpenter picked up Evans from his mother's house, in his blue Chevrolet Nova, to run errands. Carpenter and Evans went to John's Restaurant for something to eat. They then proceeded to a pager company on Atwells Avenue. Shortly after 11 a.m., Carpenter drove from Westminster Street onto Dexter Street, while Evans sat slumped in his seat, speaking to a friend on his cellular telephone. On Dexter Street, as they were passing Division Street, Evans heard what sounded like a

---

**2.** Five months later, Lorenzo Evans (Evans) was indicted for the murder of Baptista. The state's theory in the trial in the present case was that the murder of John Carpenter (Carpenter) and the assault on Evans were retribution for Baptista's murder.

gunshot, but paid no attention to it. He then heard more noises, at which point Evans dropped his telephone, "scooted down" in his seat, and looked behind him. At that time, Evans saw a black Jeep Cherokee turn onto Dexter Street from Division Street at a high rate of speed. The Jeep began chasing Carpenter's automobile. The occupants of the Jeep fired gunshots at Carpenter and Evans. As Carpenter pulled his automobile over to the opposite side of the street, the gear shift stuck. At Carpenter's urging, Evans jumped out of the automobile. Carpenter then jumped out of the automobile as well.

Evans landed in the road, where the Jeep driver tried to run over him. He ran to the nearest sidewalk. Evans then hopped the fence that was in front of him and ran down the side of a nearby house. He came to a higher fence, but as he climbed that fence, he caught his jacket and jeans on a picket.[3] As he worked to free himself, he looked to see whether he was being followed. He saw McKinney and Oliveira get out of the Jeep, both dressed in black and carrying automatic handguns. They were not wearing hoods and did not have anything covering their heads. Evans also saw Sanders, sitting in the Jeep, looking in Carpenter's direction. McKinney and Oliveira walked toward the sidewalk, where Carpenter had fallen. The gunshots continued and Carpenter was killed.

Evans freed himself from the fence and started running through yards to a nearby house. When he arrived at the house, he banged on the door; when no one answered, he ran to the side of the house and looked out into the street. There, Evans saw a white Ford Taurus with two occupants: Ferrell, who was sitting in the driver's seat, and Jermaine Campbell (Campbell), who was sitting in the front passenger seat. Ferrell was holding a "chrome object" in his hand that looked like a gun, which he moved up and down. Evans ran and ducked back behind the house, after which he heard tires screech.

When Evans came out from behind the house, the Taurus was gone. However, he saw a woman get out of an automobile. He approached her saying, "Someone's shooting at me, can I use your phone?" The man she was with told the woman to get back into the automobile, and they drove off. Evans ran down a side street trying to get to a cousin's house. However, he was stopped by the police. Evans told the police that "[m]e and my cousin were just getting shot at [--] I'm not the one you're looking for." He also told the police to look for "East cats" in a white Taurus and a black Jeep. The police arrested Evans and took him to the police station, where he was questioned by the police and detained as a suspect. While at the police station, Evans made a statement to the police in which he said that he could not identify any of the shooters. Evans later was released. The next day, he returned to the police station and identified

---

**3.** Throughout the entire year before the trial, at both bail and grand jury hearings, Evans identified the fence upon which he had been caught as being a chain link fence in the backyard of a house next door to the driveway where the murder occurred. It was clear from the photographs taken by the Providence police and by defendants that, from that angle, the crime scene could not be seen and that Evans never could have seen any of the defendants to make any kind of identifica-

tion. However, at trial, Evans changed his previous testimony and asserted that he had been caught on a picket fence not thirty feet from the murder scene, in the same yard and driveway as the murder scene, with a clear view and no obstructions. This vantage point was some seventy feet closer to where the murder had occurred than the one previously described by Evans at the bail hearing and in his grand jury testimony.

Sanders, Oliveira, and McKinney as the shooters. He also told the police that he saw Ferrell and Campbell in the Taurus.

On May 1, 1996, Oliveira, Ferrell, McKinney, Sanders, and Campbell were indicted together for the first-degree murder of Carpenter; the assault with intent to murder Evans; and two counts of conspiracy to commit each crime. They were tried together in the Superior Court in March and April 1997.[4]

Besides Evans, who testified to the facts as stated above, Elizabeth Laposata, M.D. (Dr. Laposata), the chief medical examiner for the State of Rhode Island, testified for the state. Doctor Laposata performed an autopsy on Carpenter the day after the murder. She testified that Carpenter died at 11:27 a.m. of multiple gunshot wounds to his head and body, three of them fatal, all suffered at approximately the same time. She also testified that the shots to Carpenter's head had not been inflicted until he was on the ground. Doctor Laposata described the damage inflicted by two of the three bullets, which had been fired to the left side of Carpenter's head. She testified that Carpenter's head was down on the pavement at the time the bullets entered his head, that the bullets went through the left side of his brain, crossed the midline, went into the right hemisphere of his brain, and exited via the right side of his head. As a result, the right side of his face was severely damaged and the right bones on the right side of his face and skull were fractured multiple times. Doctor Laposata also testified that she had examined Carpenter's stomach and intestines and concluded that he had not eaten during the last several hours before his death.[5]

Robert Hathaway (Hathaway), a forensic firearms expert, testified about the bullets used to kill Carpenter, as did Det. George Pearson (Det. Pearson) of the Providence police department. Detective Pearson noted that at least five spent 9–millimeter shells were found in the street around Carpenter. Moreover, a spent magazine was found, along with a magazine containing fifteen 9–millimeter cartridges. Hathaway testified that the bullets used to kill Carpenter had been fired from three different firearms.

Scott White (White) also testified for the state. White had been walking on his driveway at 108 Dexter Street toward the bus stop when he heard tires screeching and saw a man in dark clothing get out of a black Jeep holding a gun. White testified that he had seen the man's face and body clearly. He heard gunshots and got down on the ground. From there, White saw the man cross the street and heard more gunshots. White also saw two other men cross the street, but he did not see their faces. At that point, he got up and ran toward the bus stop and heard more gunfire. When White looked back, he saw a light-colored car on the curb. White called the police from a pay telephone and said that he had witnessed a shooting. He left his name and telephone number with the police. White also testified that several days after the shooting he read a newspaper article that included photos of the suspects. He recognized the photograph of Sanders as being one of the men that had fired a gun at the crime scene.

The defense put forth a number of witnesses to counter the state's evidence, as well as to secure alibis for the various

---

4. McKinney was tried simultaneously with the other defendants, and before the same trial justice, but by a separate jury.

5. Doctor Laposata's testimony was in direct conflict with Evans' testimony that he and Carpenter had eaten breakfast at John's Restaurant the morning of the murder.

defendants. Leslie Papp (Papp) testified that on December 18, 1995, he had heard gunshots and the screeching of wheels. Papp testified that he had seen a black male get out of a sports utility vehicle (SUV) wearing a nightcap. He also testified that he had observed a single set of footprints running diagonally in the snow toward the back of his property, ending at a chain link fence. These prints were widely spaced, as if made by someone running. The defendants offered this testimony to show that Evans was indeed caught on a chain link fence rather than on the picket fence, and that, consequently, he could not have seen any of the defendants.

Bernadette Waters (Waters) testified that as she was driving on Dexter Street toward Westminster Street the morning of the shooting she heard "popping sounds." Waters then saw a blue vehicle coming toward her vehicle with two men running behind it. She testified that she saw a man with a gun who she was "absolutely positive" was wearing a hood with fur around it. As she continued driving down Dexter Street, she saw a black SUV in her rear view mirror traveling in the same direction behind her. Waters then saw the SUV do a U-turn on Dexter Street and head back toward Cranston Street.

James Opella (Opella) also testified. Opella testified that on December 18, 1995, he heard tires screeching and gunfire coming from a black automobile, which was racing down Dexter Street toward Westminster Street. He also had seen a blue automobile and two men. Opella testified that he saw the Jeep make a right-hand turn onto Division Street and then do a U-turn back onto Dexter Street proceeding south. He then heard more gunshots and saw a single man being struck by gunfire

and falling to the ground just behind the blue car. Opella testified that he saw three people with Hispanic skin tones get out of the Jeep, wearing dark clothing and hoods. However, he could not see their faces clearly. The three men shot the fallen man point blank; they then reentered the Jeep and drove away.

Latoia Caprice Ward[6] (Ward) testified that Oliveira and his girlfriend, Georgia Lucas (Lucas), had arrived at Ward's house during the evening of December 17, 1995, and spent the night. The next morning, Lucas left Ward's house between 10:35 a.m. and 10:45 a.m. Ward heard the television shortly after Lucas left and discovered Oliveira in the parlor. Ward testified that she and Oliveira stayed in the house for the next two hours.

Nicholas Discullio (Discullio) testified that he had seen Ferrell at a gas station on North Main Street on the East Side at approximately 11:15 a.m. They had spoken for approximately fifteen minutes. Debra Baptista (Debra) testified that Ferrell was at her home for fifteen to twenty minutes, beginning at 10:45 a.m. to 11 a.m. Diane Baptista (Diane) corroborated Debra's testimony. Diane testified that as she prepared to take her mother to dialysis, between 10:40 a.m. and 10:50 a.m., Ferrell came to the Baptista household. When she returned home, at approximately 11:45 a.m., Ferrell still was there.

All defendants were convicted of the two conspiracies. Oliveira, McKinney, and Sanders were convicted of the murder and assault, as well. Ferrell was convicted of the assault, but acquitted of the murder. Campbell was acquitted of both substantive charges. All defendants, with the exception of Campbell, appealed.

**6.** Throughout the record there are various spellings of Ward's first name. We chose the

spelling used in the transcripts.

Their various appeals were consolidated. The defendants raise several issues on appeal.[7] We address those issues as follows. Such other facts as may be pertinent to the issues will be introduced as needed.

# I

## Discovery

On appeal, defendants argue that there were three errors related to discovery.

### (A) The Testimony of Scott White

The defendants' first argument on appeal is that the trial justice erred in refusing to exclude White's testimony because his existence as a witness had been discovered and revealed to the defense in an untimely fashion.[8] The defendants in this case filed a motion for discovery in June 1996. The state responded to that motion in July 1996. The state continued to supplement its response to defendants' discovery request through January 1997. On March 12, 1997, five days before the scheduled start of trial, the state disclosed the identity of White. The state disclosed that White's testimony would include an identification of one of the defendants, that is, Sanders. All defendants objected to White's testimony on the grounds of timeliness. The trial justice ultimately permitted White to testify.

Rule 16(a) of the Superior Court Rules of Criminal Procedure provides in pertinent part that:

"Upon written request by a defendant, the attorney for the State shall permit the defendant to inspect or listen to and copy or photograph any of the following items within the possession, custody, or control of the State, the existence of which is known, or by the exercise of due diligence may become known to the attorney for the State:

" * * *

"(6) a written list of the names and addresses of all persons whom the attorney for the State expects to call as witnesses at the trial in support of the State's direct case[.]"

Rule 16(i) provides for sanctions in the event that a party fails to comply with the discovery rules:

"If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, it may order such party to provide the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material which or testimo-

---

7. All four defendants submitted briefs to support their appeal. In addition, the attorneys for Oliveira, Sanders, and Ferrell argued before this Court on May 17, 2001. Pursuant to an order issued on May 15, 2001, the attorney for McKinney was heard by this Court on June 6, 2001. Accordingly, this opinion takes into consideration both the arguments and memoranda filed by all four defendants.

8. Sanders raised this issue and fully briefed it on appeal. The defendants Oliveira, Ferrell, and McKinney adopted Sanders' argument, without comment, in their respective briefs. The state cites *O'Rourke v. Industrial National Bank of R. I.*, 478 A.2d 195, 198 n. 4 (R.I.

1984), and argues that Oliveira, Ferrell, and McKinney's failure to brief and argue the issue for themselves "constitutes a waiver." Rule 16(a) of Article I of the Supreme Court Rules of Appellate Procedure provides in pertinent part that "[e]rrors not claimed, questions not raised and points not made ordinarily will be treated as waived and not be considered by the [C]ourt." Here, defendants expressly have claimed error; they have done so by adopting the argument of Sanders in their respective briefs. We find that defendants face no impediment to adopting another defendant's argument in a consolidated case on appeal.

ny of a witness whose identity or statement were not disclosed, or it may enter such other order as it deems appropriate."

"When considering an alleged nondisclosure, a trial justice, and this [C]ourt on appeal, should examine four factors: '(1) the reason for nondisclosure, (2) the extent of prejudice to the opposing party, (3) the feasibility of rectifying that prejudice by a continuance, and (4) any other relevant factors.' " *State v. Ricci*, 472 A.2d 291, 299 (R.I.1984) (quoting *State v. Coelho*, 454 A.2d 241, 245 (R.I.1982)). "[F]orbidding a party to call a witness is a drastic sanction that should be imposed only if it is apparent that the violation has or will result in prejudice to the party asserting the violation." *State v. Ashness*, 461 A.2d 659, 673 (R.I.1983) (quoting *Gormley v. Vartian*, 121 R.I. 770, 775, 403 A.2d 256, 259 (1979)). On appeal, the question is "whether a Rule 16 violation occurred and * * * if so, whether the trial justice abused [her] discretion in fashioning a remedy." *State v. Garcia*, 643 A.2d 180, 186 (R.I.1994) (quoting *State v. LaChapelle*, 638 A.2d 525, 530 (R.I.1994)); *see also Ashness*, 461 A.2d at 673 ("[i]t is within the sound discretion of the trial justice to decide whether to allow a witness to testify whose name was not provided to a party who properly filed for discovery") (citing *Gormley*, 121 R.I. at 774 n. 1, 403 A.2d at 258 n. 1; *Buckler v. Sinclair Ref. Co.*, 68 Ill.App.2d 283, 216 N.E.2d 14, 18 (1966); *Southern Pacific Co. v. Watkins*, 83 Nev. 471, 435 P.2d 498, 512 (1967)).

In the instant case, the trial justice found "no deliberate or willful efforts on the part of either the Providence police or the State to delay[,] * * * suppress or hide the existence of * * * Scott White."

The defendants conceded that the state's action was neither willful, nor deliberate. Instead, defendants argue that the trial justice erred by ignoring the actual prejudice suffered by defendants and by granting a continuance as a remedy. They maintain that the actual prejudice suffered was so great that no short continuance could rectify or redress it.

█ When a nondisclosure is unintentional, "[t]he burden of establishing procedural prejudice * * * lies with defendant." *State v. Squillante*, 622 A.2d 474, 478 (R.I. 1993). "[I]n order '[t]o demonstrate procedural prejudice on appeal, defendant must show that had the information been disclosed, there is a likelihood that trial counsel, * * * could have created a reasonable doubt in the minds of one or more jurors to avoid conviction.' " *Garcia*, 643 A.2d at 187 (quoting *State v. Concannon*, 457 A.2d 1350, 1354 (R.I.1983)). Here, defendants never made such a showing. The defendants assert that they were "obliged [to] restructure [their] entire defense within three (3) days and essentially wing [their] defense of an eye witness." That is not the case. The shooting here occurred in broad daylight, in a well-populated area. Witnesses had seen the black Jeep pursuing the blue Nova, had seen three men in dark clothing alight from the Jeep with guns,[9] and had heard gunshots over Carpenter's body. White's information was, thus, cumulative, not different from that information originally available to defendants. Moreover, White gave his statement to the state on March 12, 1997, and defendants received it that same day. They then had *over* a month in which to prepare a cross-examination because White did not testify until April 16, 1997. Accordingly, we find that the trial justice

---

**9.** While Evans testified that only two men exited the Jeep and that Sanders had been sitting in the driver's seat the entire time, Opella testified that *three* men, all wearing dark clothing, had exited the Jeep and shot at Carpenter.

### (B) The Testimony of Detective Corley About Footprints and a Picket

■ The defendants next argue that the trial justice erred in refusing to prevent Det. John J. Corley (Det. Corley) from testifying about matters that the state had not previously disclosed to the defense in discovery, that is, that he had noticed footprints in the snow and that he had seen a freshly broken picket on a fence bordering the backyard of 102 Dexter Street.[10] In his statement to police the day after the shooting, and in his testimony at a subsequent bail hearing and before the grand jury, Evans said that he ran from the shooters, jumped over one chain link fence, then tried to climb another chain link fence, when his jacket got caught. It was at this point, while caught on the second chain link fence, that Evans said that he turned his head toward Dexter Street, saw McKinney and Oliveira shooting guns, and saw Sanders in the driver's seat of the Jeep.

Just a few weeks before trial, however, Evans changed his story and told the police that the fence he had been caught on was a wooden picket fence. This change was critical because Evans could not have seen the shooters from the vantage point of the second chain link fence, but he could have seen them from the picket fence. In the midst of trial, it was revealed that Det. Corley, who was on the scene immediately after the shooting, observed a set of footprints in the snow leading from the driveway of 102 Dexter Street directly back to the picket fence. This information came to light when Lt. Edward Downing (Lt. Downing), the state's second witness, was asked on cross-examination whether he had looked for or seen any footprints in the snow. An objection to that question was sustained. Lieutenant Downing was then asked whether he had tried to discern in which direction the suspects had left the scene. He responded that he personally had not, but that another police officer, Det. Corley, had been in the area looking for either footprints or tire marks. Pursuant to Rule 16 the state had previously provided the defense with Det. Corley's name. However, the state had never disclosed to the defense that Det. Corley had seen footprints leading to the picket fence and a broken picket, and that he would testify accordingly.

The defense asked the trial justice to preclude Det. Corley from testifying about his observations of the footprints and the fence. The trial justice denied defendants' request. The case was continued for three days. In the trial justice's view, Det. Corley was not a new witness, but rather a witness with "somewhat of an elaboration" to offer with regard to his testimony.

Rule 16(a) provides in pertinent part that:

> "Upon written request by a defendant, the attorney for the State shall permit the defendant to inspect or listen to and copy or photograph any of the following items within the possession, custody, or control of the State, the existence of which is known, or by the exercise of due diligence may become known to the attorney for the State:
>
> " * * *
>
> "(7) as to those persons whom the State expects to call as witnesses at the trial, all relevant recorded testimony before a grand jury of such persons and all written or recorded verbatim statements, signed or unsigned, of such per-

---

**10.** Oliveira raised this issue and fully briefed it on appeal. The defendants Ferrell and McKinney adopted Oliveira's argument, without comment, in their respective briefs.

sons and, if no such testimony or statement of a witness is in the possession of the State, a summary of the testimony such person is expected to give at the trial[.]"

As previously mentioned, Rule 16(i) provides for sanctions in the event that a party fails to comply with the discovery rules, and our case law provides four factors that a trial justice must consider when dealing with alleged nondisclosure: (1) the reason for the nondisclosure, (2) the extent of prejudice to the opposing party, (3) the utility of a continuance to redress that prejudice, and (4) any other relevant factor. *See Ricci*, 472 A.2d at 299 (citing *Coelho*, 454 A.2d at 245).

In the instant case, the trial justice found that the state's nondisclosure was inadvertent. Additionally, the trial justice found that the state's inadvertent failure to disclose the information did not cause the defendants any procedural prejudice. Nowhere in the record did defense counsel illustrate any concerns that their clients would suffer prejudice not remediable by the three-day continuance. The defendants' present claim that "such a short time * * * was hardly sufficient for the defense" was not presented to the trial justice below and, thus, is not properly before this Court. *See State v. Toole*, 640 A.2d 965, 972–73 (R.I.1994) ("[a]ccording to our well-settled 'raise or waive' rule, issues that were not preserved by a specific objection at trial 'sufficiently focused so as to call the trial justice's attention to the basis for said objection, may not be considered on appeal' ") (citing *State v. Warren*, 624 A.2d 841, 842 (R.I.1993)). Moreover, Det. Corley's testimony about the footprints in the snow and the broken picket were prompted by the cross-examination of Lt. Downing by McKinney's attorney. This Court has previously held that it is

proper to call a rebuttal witness when new information has been disclosed through cross-examination. *See State v. Powers*, 566 A.2d 1298, 1305 (R.I.1989) ("a defendant's testimony may be 'subjected to a searching cross-examination to rebut not only the facts stated but also the inferences and conclusions that might be drawn from such testimony.' * * * Such evidence generally includes any 'competent evidence which explains, contradicts or replies to any new matter raised by the defense.' "). Accordingly, we find that the trial justice did not abuse her discretion by allowing Det. Corley to testify about the footprints and broken picket.

### (C) The Alibi Testimony

The defendant Ferrell also argues that the trial justice erred when she precluded him from offering alibi testimony from Baptista's mother, Debra.[11] In defense discovery, Ferrell had first stated that Debra would "testify that she saw the defendant, Jason Ferrell, on December 18, 1995 at 17 Evergreen Street, in the City of Providence, State of Rhode Island." The state moved to compel more responsive answers concerning the alibi witness, on the ground that defendant had "not provided an adequate summary" of the expected testimony. Ferrell responded that "Debra Baptista will testify that she saw and spoke to defendant between 10:45 a.m. and 11:15 a.m. on December 18, 1995, at her home located at 17 Evergreen Street, Providence." However, when Debra took the stand to testify, she not only testified that Ferrell had come to her house "between quarter to eleven and 11:00," that she spoke to him, and that he left "between like ten after, quarter past 11:00," but she also testified that after he left, she "beeped" him. Ferrell's attorney then asked her, "How much time had gone by

---

11. Ferrell raised this issue and fully briefed it on appeal.

from the time that you—that Mr. Ferrell left and the time you beeped Mr. Ferrell?" At that point, the state's attorney objected. At the bench, Ferrell's attorney told the trial justice that Debra had provided the investigator with this information, along with information that Ferrell had returned to her house and remained there until approximately 11:35 a.m., but that it had not been provided to the state. After a *voir dire* of Debra, the trial justice determined that:

> "The answer that the defendant provided is that Debra Baptista will testify that she saw and spoke to defendant between 10:45 and 11:15 a.m. [Y]ou are precluded from going beyond 11:15. This is a clear and unequivocal Rule 16 violation for which you have no explanation."

Rule 16(c) provides in pertinent part that:

> "In the event a defendant seeks any discovery under subdivision (a) of this rule, then upon demand by the attorney for the State and delivery by him or her to the defendant of a written statement describing with specificity the date and time when and the place where the offense charged is alleged to have occurred, the defendant, within twenty-one (21) days after receipt of such demand and particulars, shall give written notification whether he or she intends to rely in any way on the defense of alibi. If the defendant does so intend, the notice shall state with specificity the place at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses the defendant intends to call at the trial to establish such alibi."

Again, we note that Rule 16(i) provides for sanctions for noncompliance with the dis-

covery rules, and that a trial justice must consider the four factors set forth in *Ricci* when dealing with nondisclosure.

■ In the instant case, the trial justice addressed the first of the four factors: she found that there was "no explanation" offered by the defense for not having disclosed to the state that Ferrell had returned to Debra's home and remained there until approximately 11:35 a.m. However, the trial justice did not specifically address the remaining three factors. Nonetheless, we find that the trial justice did not abuse her discretion by precluding Debra's testimony about Ferrell's return to her home, since the state had no notice that defendant intended to offer an alibi for the time period that that testimony would have covered. *See State v. Nardolillo*, 698 A.2d 195, 201–02 (R.I.1997) (finding that exclusion was not an excessive sanction for testimony catching state "entirely by surprise * * * [as][t]he state, as well as the defendant, has a clear right to rely upon compliance with Rule 16 discovery requirements and obligations"); *see also State v. Engram*, 479 A.2d 716, 719 (R.I.1984) (noting that where "there [has been] no substantial compliance with the rules [of discovery providing for notice of alibis]. * * * [T]he trial justice did not abuse his discretion [by] precluding defendant's witnesses from testifying concerning [his] proposed alibi.").

## II

### The Out–of–Court and In–Court Identifications

The defendants' second argument on appeal is that the trial justice erred in admitting evidence of White's out-of-court identification of Sanders from photographs in a newspaper [12] and in permitting an in-court

---

**12.** There were two separate out-of-court identifications—one occurred shortly after the

identification.[13] They maintain that the pretrial identification procedures were "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247, 1253 (1968); *see also State v. Andrade*, 544 A.2d 1140, 1145 (R.I. 1988) (" '[a] witness' out-of-court identification of an accused is not admissible at trial if the identification procedure used was so unnecessarily suggestive and conducive to a substantial likelihood of misidentification that the accused was denied due process of law' ").

■■■ In determining whether an identification procedure has violated due process, this Court employs a two-part test: first, the Court must consider whether the procedures used in the identification process were unnecessarily suggestive; then, if the Court finds that the procedures were unnecessarily suggestive, the Court must determine whether the identification lacks independent reliability, despite the suggestive nature of the procedures. *See State v. Camirand*, 572 A.2d 290, 293 (R.I.1990); *State v. Barnes*, 559 A.2d 136, 140 (R.I. 1989); *State v. Nicoletti*, 471 A.2d 613, 615 (R.I.1984). However, absent state action, the due process exclusionary rules do not apply to identification procedures. *See State v. Pailon*, 590 A.2d 858, 863 (R.I. 1991). Here, the trial justice correctly found that the pretrial identification of Sanders by White, at work, from the newspaper photograph, a couple of days after the events herein took place, did not involve state action, thus, the due process exclusionary rules do not apply to that identification. *See State v. Gomes*, 604

A.2d 1249, 1254 (R.I.1992) (noting that a motion to suppress an identification "should not be granted on the basis of private actions such as a witness' exposure to newspaper articles," because private influences on identification can be tested through cross-examination).

■■■ With regard to White's identification of Sanders at the Providence police station in 1997, when Det. Frank Altomari (Det. Altomari) showed White the same newspaper article he had seen a couple of days after the murder, the trial justice found that although this was "not a perfect procedure," it did not "rise to the level of being unnecessarily suggestive." The trial justice also found that the identification did not lack independent reliability: Before Sanders was identified at the police station, White already had seen the photograph and identified Sanders. Thus, the trial justice did not err in refusing to suppress either of the out-of-court identifications. *See State v. Hadrick*, 523 A.2d 441, 443 (R.I.1987) ("I am satisfied here that when she went to the police station, even long before the lineup and gave the description and then assisted in the setting together or putting together of a picture composition of the alleged robber, that she had at that time in her brain a branded image of the alleged robber. In her brain was branded that imprint, that identification of the person who had committed the robbery.").

■■■ Because the out-of-court identifications were found to not have been unduly suggestive, the trial justice was not required to conduct any preliminary evidentiary hearing before allowing the in-court identification of Sanders. *See State*

---

events involved herein took place and the other occurred in 1997 at the Providence police station.

**13.** Sanders and Oliveira raised this issue and fully briefed it on appeal. The defendants Ferrell and McKinney adopted their arguments, without comment, in their respective briefs.

*v. Addison,* 748 A.2d 814, 818 (R.I.2000) ("[i]f we find that the out-of-court identification was not impermissibly suggestive, then of course [the] in-court identification of the defendant would necessarily follow to be proper") (citing *State v. Gardiner,* 636 A.2d 710, 716 (R.I.1994)). Moreover, "[w]hen reviewing a trial justice's decision on a motion to suppress eyewitness testimony, the reviewing court applies the 'clearly erroneous' rule and views the evidence in the light most favorable to the state." *State v. Luciano,* 739 A.2d 222, 226 (R.I.1999) (citing *State v. Gatone,* 698 A.2d 230, 235 (R.I.1997)). Accordingly, we conclude that the trial justice did not err in refusing to suppress White's in-court identification.

### III

### The Jury Questioning

The defendants' third argument is that the trial justice erred in questioning jurors collectively, rather than individually, about whether any of them had seen an article in the metro edition of *The Providence Journal.*[14] On March 26, 1997, an article appeared in *The Providence Journal* under the headline "Armory Murder Trial Opens; State Lays Out Revenge Theory." As a result, defendants joined in a motion to examine the jurors, individually, with respect to their contact with, or knowledge of, the article. The trial justice deferred hearing any argument on the motion and instead posed the question, "has anyone seen or read that article?" to both juries. They responded in the negative. Thereupon, the trial justice denied defendants' motion.

 This Court has held that the extent to which newspaper or television publicity threatens the integrity of a trial depends on the nature of the publicized information and the degree of juror exposure to it. *See State v. Hightower,* 661 A.2d 948, 955 (R.I.1995); *Palmigiano v. State,* 120 R.I. 402, 407–08, 387 A.2d 1382, 1385 (1978). "It is only under circumstances where the jury has been exposed to prejudicial information that the trial court is obliged, in its sound discretion, to take appropriate measures to assure a fair trial." *State v. Cline,* 122 R.I. 297, 318, 405 A.2d 1192, 1203 (1979). While "a trial justice has an affirmative duty to conduct an initial inquiry to determine whether the juror has been prejudiced [by improper exposure, it is only] * * * [u]pon completion of this initial inquiry [that] the trial justice then must determine whether further inquiry of the juror or the entire jury is necessary to ensure that the juror and the other jurors have not been prejudiced and can continue to serve as fair and impartial fact-finders." *State v. Chiellini,* 762 A.2d 450, 453 (R.I.2000). "The decision to conduct voir dire, like the declaration of a mistrial, is * * * left to the trial justice's discretion, and that decision will not be disturbed unless [there has been] an abuse of discretion * * *." *State v. DaSilva,* 742 A.2d 721, 725 (R.I.1999); *see also State v. Tracy,* 741 A.2d 281, 281 (R.I.1999). In the instant case, the trial justice collectively asked each jury whether its members had read or heard about the article in question. Both juries separately responded in the negative. We find that the question posed by the trial justice was a simple one in which a yes or no answer would have sufficed to reveal any prejudice. Accordingly, we hold that the trial justice did not abuse her discretion by declining to individually *voir dire* the jurors.

---

**14.** Oliveira and Sanders raised this issue and fully briefed it on appeal. The defendant Ferrell adopted their arguments, without comment, in his brief.

## IV

## The Remarks by Counsel

█ The fourth argument made by defendants on appeal is that the trial justice erred by refusing to grant a mistrial after Campbell's attorney remarked in closing argument to the jury that "[n]ot one of these five defendants has testified as to whether or not they ever knew John Carpenter."[15] The attorneys for Ferrell, Sanders, and Oliveira immediately objected. The trial justice sustained their objections and instructed the jury to disregard counsel's statement. Campbell's attorney then continued his closing argument, stating:

> "[There was] [n]o testimony that my client knew John Carpenter. * * * We don't know who knew John Carpenter, who didn't know John Carpenter. We don't know who knew Lorenzo Evans before this. No one has testified how they knew Lorenzo Evans. We simply have what Lorenzo Evans stated, that is, that he knew all of the defendants."

When Campbell's attorney finished his closing argument, the juries were taken out of the courtroom. Oliveira's counsel then asked for a cautionary instruction and Ferrell's counsel asked the trial justice to consider a motion to pass. Sanders's attorney joined in Ferrell's motion to pass. The trial justice denied the motion to pass, noting that the motion was not made at the appropriate time. When the jury was brought back in, the trial justice instructed the juries as follows:

> "Ladies and gentlemen, before we continue with the arguments of counsel, I need to remind you that [the attorney for Campbell] may have alluded to the fact no one testified in this case, and he did not do that to draw any inference of

guilt against any of the defendants. As you know, and you will hear me say over and over, no defendant in this case has testified and no defendant may be compelled by the State to testify in any criminal case, nor can anyone comment if a defendant decides not to testify, for a defendant is free to testify or not to testify as he chooses.

> "The fact that a defendant did not testify may not be considered by you for any purpose, and [you] may not draw any inference of the guilt or innocence of the defendant. It may not enter into your deliberations under any circumstance, and there is a very good reason for that. The privilege not to testify is a privilege that is enjoyed by all of us. If we are penalized in any way, in any way for exercising a privilege, then it is not a privilege at all. And that is a very important concept for you to accept."

There was no objection to that instruction. The trial justice, in her final charge to the jury, again reminded its members that they "must not draw any inference of guilt from the defendant's decision not to testify." Again, there was no objection to the jury instruction.

█ "The Fifth Amendment clearly prohibits any adverse comments by either the prosecution or the trial justice on an accused's decision not to testify." *State v. Gibbons*, 418 A.2d 830, 835 (R.I.1980) (citing *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106, 110 (1965)). We note:

> "Because the prejudice to an accused is the same regardless of who comments on his failure to testify, it is our opinion that for the same reasons that a prosecutor may not comment on an accused's election to remain silent, counsel for a

---

**15.** Sanders raised this issue and fully briefed it on appeal. The defendants Oliveira and Ferrell adopted Sanders' argument, without comment, in their respective briefs.

codefendant also may not comment. Our primary concerns are the effect the comment is likely to have on the jury and the resulting prejudice to the rights of an accused. The identity of the person making the comment is not material." *Gibbons*, 418 A.2d at 835–36 (citing *United States v. Kaplan*, 576 F.2d 598, 600 (5th Cir.1978), *cert. denied*, 439 U.S. 1078, 99 S.Ct. 858, 59 L.Ed.2d 47 (1979)). "If such error is to be cured, it is essential that a cautionary instruction be given immediately in order that the seed planted by the remark will not be given time to germinate. In addition to immediacy, adequacy is required. The cautionary instruction must be such that the jury is informed in language understandable by the ordinary, reasonable man that the defendant has a constitutional right to be free from compulsion of any kind, physical or mental, to testify in his own defense." *State v. Sherman*, 113 R.I. 77, 81–82, 317 A.2d 445, 448 (1974). Moreover, "it is well-settled law that motions to pass a case and declare a mistrial are matters left to the sound discretion of the trial justice." *State v. Figueroa*, 673 A.2d 1084, 1091 (R.I.1996) (citing *State v. Martellini*, 533 A.2d 527, 529 (R.I.1987)). "The reason we vouchsafe such broad power in the trial justice in this regard is 'that he or she possesses a "front-row seat" at the trial and can best determine the effect of the improvident remarks upon the jury.' " *Figueroa*, 673 A.2d at 1091 (quoting *State v. Tempest*, 651 A.2d 1198, 1207 (R.I.1995)). "Therefore, the determination of the trial justice

concerning a ruling on a motion to pass a case and to declare a mistrial will be given great weight, and we will not disturb that determination unless it is clearly wrong." *Figueroa*, 673 A.2d at 1091. In the instant case, the trial justice on two separate occasions instructed the jury that defendants need not testify, and that no adverse inference was to be drawn from a defendant's election not to testify. Accordingly, we hold that the three separate instructions given by the trial justice "ameliorated any possible damage to the deliberative process in a procedure that was both corrective and correct." *Id.*

## V

### The Trial Justice's Refusal to Recuse Herself

■ The defendants' fifth argument is that the trial justice erred in refusing to recuse herself from presiding over the trial because she was a candidate for Associate Justice of the Supreme Court of Rhode Island.[16] On or about April 9, 1997, the Governor announced his nomination of the trial justice to the Supreme Court. The nomination was then scheduled to proceed to the General Assembly for approval. The mother of the victim in this case (that is, Carpenter) sat on the House Judiciary Committee, which was scheduled to act upon the nomination.[17] All defense counsel, sensing a perceived conflict of interest, moved to have the trial justice declare a mistrial.[18] The state opposed that motion. The trial justice denied the motion. On

---

**16.** Sanders and McKinney raised this issue and fully briefed it on appeal. The defendants Ferrell and Oliveira adopted their arguments, without comment, in their respective briefs.

**17.** The trial in the instant case began on March 25, 1997, and ended on April 24, 1997, with the return of the jury verdicts. On April 29, 1997, the House Judiciary Committee ap-

proved the trial justice's nomination to the Rhode Island Supreme Court. Marsha Carpenter, the victim's mother, abstained from voting because the trial justice "was the judge in the recently completed trial of her son's murderers."

**18.** Previously, defense counsel had sought to have the trial justice recuse herself.

appeal, none of the defendants alleged any *actual* improprieties to have taken place. Rather, they argued that it was merely "the appearance of impropriety occasioned by the nominating process" that should have impelled the trial justice to disqualify herself.

■■■■■ Canon 2 of Article VI of the Supreme Court Rules of Judicial Conduct provides that a trial justice "shall avoid impropriety and the appearance of impropriety in all of the [trial justice's] activities." This includes the reality that:

"A [trial justice] shall not allow family, social, political or other relationships to influence the [trial justice's] judicial conduct or judgment. A [trial justice] shall not lend the prestige of judicial office to advance the private interests of the [trial justice] or others; nor shall a [trial justice] convey or permit others to convey the impression that they are in a special position to influence the [trial justice]." Canon 2(B).

Likewise, Canon 3 states that a trial justice "shall perform the duties of [his or her] judicial office impartially and diligently." Section E of Canon 3 requires that a trial justice "disqualify himself or herself in a proceeding in which the [trial justice's] impartiality might reasonably be questioned." However, "before [this Court] will require a trial justice to recuse himself or herself to avoid the appearance of impropriety, facts must be 'elicited indicating that it is reasonable for members of the public or a litigant or counsel to question the trial justice's impartiality.' " *State v. Lessard,* 754 A.2d 756, 759 (R.I.2000) (quoting *State v. Clark,* 423 A.2d 1151, 1158 (R.I.1980)). " '[R]ecusal is not in order by a mere accusation that is totally unsupported by substantial fact.' " *Id.* Moreover, "[a] judge has as great an obligation not to disqualify [her]self when there is no occasion to do so as [s]he has to

do so when the occasion does arise." *In re Antonio,* 612 A.2d 650, 653 (R.I.1992) (quoting *Clark,* 423 A.2d at 1158). "[M]ere assertions and accusations * * * unsupported by the record" do not present that occasion. *Lessard,* 754 A.2d at 759.

In the instant case, none of the defendants suggested that the victim's mother actually influenced the trial justice. The question then was not whether the defendants subjectively believed that the trial justice's future was dependent, in whole or in part, on the vote, influence, and deliberations of a body on which the victim's mother sat, but whether this had any connection, real or reasonably perceptible, to the conduct of the trial. *See Lessard,* 754 A.2d at 759 ("The trial justice's mere comments on the sufficiency of the state's evidence and his inquiry of the complaining witness concerning her opinion about the proposed plea bargain were not of themselves grounds for recusal."); *State v. Cruz,* 517 A.2d 237, 241 (R.I.1986) ("It borders upon the frivolous to suggest that membership in an organization consisting of approximately 365 persons in common with an individual whom the trial justice would not recognize without assistance would create any actual or apparent impartiality on the part of a trained and experienced trial judge."); *Clark,* 423 A.2d at 1158 (noting that "at most, the record indicates that the trial justice and the prosecutor were acquaintances. Mere acquaintanceship between members of the bench and bar, particularly in a state the size of Rhode Island, is not a ground for recusal. If it were, the state's judicial system might well grind to a halt."). We conclude that there was no such connection.

We further note that, without such a connection, trust in the integrity of judges is a necessary prerequisite for the very survival of our system of law:

"It is only when the people are satisfied that impartial judges decide their controversies, that they entertain feelings of reverence for the judgments of the courts of the land. We say the people. We mean the people at large. There are always discontented, unhappy, and morose spirits who will question the good intentions of judges, though they be men of spotless honor and blameless life. Such men had no criterion of praise or blame, except in so far as they can see personal profit or personal loss to themselves, measured by the results of the cases which they conduct before the courts. The views of such persons count for nothing. But it is of immense importance, not only that justice shall be administered to men, but that they shall have no sound reason for supposing that it is not administered. It is of lasting importance that the body of the public should have confidence in the fairness and uprightness of the judges created to serve as dispensers of justice. The continuance of this belief, so long entertained by the people of this country, and so well warranted by the history of the judiciary as a body, is largely essential to the future existence of our institutions in their integrity. We say it is a fundamental principle that the judge shall be impartial [* * *].

"Beyond question it is not according to due course of law to compel a man over his protest to try his case before a judge who has already decided it, and has announced that decision in advance of the hearing. It is equally true that such compulsion is a denial of justice.

"In what has been said we are not to be understood as holding that a judge can be recused on the ground that he has already decided the case, merely by motion supported by affidavits so stating. It must appear, as in the present case, beyond any doubt that such decision has been made. If the judge den[ies] such to be the fact, that ends the controversy; and it cannot be pursued further, or re-examined on that point in this court [* * *]. [I]t is not meant that a judge must, in the kind of case before us, make denial on special oath when so charged. Any statement by him on the subject must be regarded as made under his official oath." *Turnbo v. Turnbo*, No. 01A01–9307–CH–00314, 1994 WL 44943 at *4–5 (Tenn.Ct. App. Feb.16, 1994) (quoting *In re Cameron*, 126 Tenn. 614, 151 S.W. 64 (1912)).

*See also* Charles Bleil & Carol King, *Focus on Judicial Recusal: A Clearing Picture*, 25 Tex.Tech.L.Rev. 773, 798–99 (1994) (" 'An independent, unbiased, disinterested, fearless judiciary is one of the bulwarks of American liberty, and nothing should be suffered to exist that would cast a doubt or shadow of suspicion upon its fairness and integrity.' "); Denelle J. Waynick, *Judicial Disqualification: The Quest for Impartiality and Integrity*, 33 How. L.J. 449, 460 (1991) ("[I]t is clear that: '[* * *] [i]mpartiality of courts lies at the heart of our system of justice [* * *] it is what makes the system work [* * *].' ").

## VI

### The Remarks of the Trial Justice

The sixth argument of defendants is that the trial justice erred in not passing the case when, in the presence of the jury, she made an inappropriate remark.[19] Specifically, a witness had just resumed the stand

---

19. Sanders and McKinney raised this issue and fully briefed it on appeal. The defendants Oliveira and Ferrell adopted their arguments, without comment, in their respective briefs.

when the trial justice interrupted the prosecutor's first question to the witness to ask, "Can you check and see if that microphone is on?" Someone attended to the device, whereupon the trial justice commented: "There we go. Sometimes you are just surrounded by assassins." After a brief conference at the bench, the trial justice addressed both juries:

> "Ladies and gentlemen, I made an inappropriate remark when I commented about the microphone being turned off. No one has yet confessed as to who did that, but please disregard my comments. I attempted at levity, and I completely failed, and * * * counsel rightfully brought that to my attention.
>
> "I don't usually put my foot in it, but when I do, I do big time, and I apologize to all of you."

Moreover, at the close of the trial, the trial justice addressed both juries[20] as follows:

> "Finally, ladies and gentlemen, I wish to make it perfectly clear to all of you that neither by these instructions nor by any ruling or remark or comment that I have made during the trial, have I or do I intend to indicate to any of you any opinion which I may have regarding the issues and facts and the evidence before you. I am telling you now, ladies and gentlemen, I have no such opinion. My job here is to rule on questions of law. Your job is to determine the facts and to assess the credibility, and that is a function which is solely belonging to the jury."

 "When a criminal defendant's claim of error rests on allegedly prejudicial remarks made by the trial justice, this Court weighs the potential prejudicial impact that any such comments may have had on the trial jury." *State v. Hornoff,* 760 A.2d 927, 935 (R.I.2000) (citing *State v. Austin,* 742 A.2d 1187, 1192 (R.I.1999)). We are satisfied that the defendant's right to a fair trial was not prejudiced in any way by this seemingly inappropriate remark made by the trial justice. Our careful review of the record indicates that the trial justice conducted herself, throughout the trial, in a commendably fair and impartial manner. In her charges to the juries, the trial justice made it clear that any remarks made by her during the course of the trial should not be construed as evidence or an indication of any opinion she may have about the facts or the evidence. Moreover, the trial justice did explain to the juries that it was their function, and their function alone, to make factual determinations and assess the credibility of witnesses. Based on the foregoing analysis, we conclude that the trial justice, at all times during the trial, maintained the requisite judicial impartiality, and that defendants' claim of error is without merit.

## VII

### The Opinion Testimony

 The defendants' seventh argument on appeal is that the trial justice erred when she allowed the state, over the defendants' objection, to ask Papp, a defense lay witness, to identify the type of shoe that made the prints that the witness had observed in his backyard leading to a chain link fence.[21] In response to the prosecu-

---

**20.** The charge quoted above was given to both juries except that the last two sentences of the charge to McKinney's jury were as follows: "My role is to report here and to rule on questions of law. Your role is to rule on questions of fact and the credibility of the witnesses." Otherwise, the charge to McKin-

ney's jury was exactly the same as the charge given to the jury for the other four defendants.

**21.** Oliveira and McKinney raised this issue and fully briefed it on appeal. The defendant

tor's question about what type of a shoe Papp thought had made the prints leading diagonally from the side of his driveway and through the backyard, not toward a picket fence, but toward a chain link fence in the left rear corner of his property, Papp responded: "I couldn't say honestly what it was, you know, I am—an impression, but I can't say for sure what it was. * * * In the back of my mind I would say probably like a sneaker."

 Rule 701 of the Rhode Island Rules of Evidence governs lay witness testimony. Rule 701 provides that:

"If the witness is not testifying as an expert, the witness' testimony in the form of opinions is limited to those opinions which are (A) rationally based on the perception of the witness and (B) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."

"Opinion testimony may be rendered when 'the subject matter to which the testimony relates cannot be reproduced or described to the jury precisely as it appeared to the witness at the time, and the facts upon which the witness is called to express an opinion are such that [persons] in general are capable of comprehending.' " *State v. Bettencourt,* 723 A.2d 1101, 1111 (R.I.1999) (quoting *State v. Bowden,* 473 A.2d 275, 280 (R.I.1984)). "Our review of the trial court's decision to permit opinion testimony by a lay witness is limited to determining whether the trial justice abused his or her discretion by allowing such testimony." *State v. Wilding,* 740 A.2d 1235, 1242 (R.I. 1999) (citing *State v. Mallett,* 600 A.2d 273, 276 (R.I.1991)).

Accordingly, we are of the opinion that the trial justice did not abuse her discretion by allowing Papp to testify that the print he saw in the snow appeared to have been made by a sneaker. *See People v.*

*Holmes,* 41 Ill.App.3d 956, 354 N.E.2d 611, 617 (1976) (noting that arresting officers could properly testify that defendant's shoe print had the same indentation on the left heel as the shoe print found at the scene of the crime, and the lack of expertise of the witnesses only went to the weight, not to the admissibility, of the evidence); *State v. Drake,* 298 S.W.2d 374, 376 (Mo.1957) (noting that there was no error when a non-expert testified that shoe marks at the scene of a burglary were made by defendant's shoes, since the non-expert's testimony was as to personally observed facts); *State v. Plowden,* 65 N.C.App. 408, 308 S.E.2d 918, 919 (1983) ("The basis or circumstances behind a non-expert opinion on a shoe print do not affect the admissibility of the opinion; instead, they go to the weight of such evidence."); *State v. Hairston* 60 Ohio App.2d 220, 396 N.E.2d 773, 775 (1977) (" 'If the fact to be established must "be derived from a series of instances passing under the observation" of witnesses, "which yet they never could detail to the jury," opinion evidence will be received. To state the matter another way, non[-]experts may state their opinions in all cases where their conclusions are based upon a number of indescribable facts. * * * ' " and "[to] detail the pattern characteristics observed which give rise to the conclusion that they were made by tennis shoes would be difficult if not impossible. The description of the prints as made by 'tennis shoes' sums up those many characteristics into one comprehensible observation well within lay capabilities and might be more properly denoted the statement of a composite fact").

# VIII

### The Out–of–Court Statement of Lenneth Fisher

 The defendants' eighth argument on appeal is that the trial justice erred by

Ferrell adopted their arguments, without comment, in his brief.

allowing Evans to testify to an out-of-court statement made to him by a man named Lenneth Fisher (Fisher).[22] In May 1996, Evans was charged with the murder of Baptista. Pending trial, Evans was held in protective custody in the Intake Center at the Adult Correctional Institutions (ACI), the same facility where Oliveira, McKinney, Sanders, and Campbell were incarcerated pending their trial. Also housed at the Intake Center were two men, Jason Souza and Fisher, both witnesses against Evans in the Baptista slaying. The only evidence linking Fisher and any of the defendants was Evans' testimony that six months before Carpenter's death, Evans had seen Fisher in the company of McKinney and Oliveira at a nightclub. At trial, the state wanted Evans to testify to a statement made to him at the Intake Center by Fisher. Fisher had allegedly told Evans that if Evans did not testify in the Carpenter case, then Fisher would not testify against Evans in the Baptista case ("If I didn't testify, he wouldn't testify"). The defense objected on hearsay grounds.

To establish Fisher's unavailability, the state called Det. Altomari to testify. Detective Altomari testified that a week or two before trial, a warrant had been issued for Fisher's arrest. Detective Altomari also testified that, since the trial's start, a Det. Finnegan had been searching for Fisher and that he himself believed that other members of the police department also were looking for Fisher. The trial justice found that Fisher was unavailable and, thus, allowed Evans to testify about Fisher's statement, ruling that it was admissible as a hearsay exception, pursuant to Rule 804 of the Rhode Island Rules of Evidence.[23]

■■■ " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." R.I. R. Evid. 801(c). "Statements not offered to prove the truth of what they assert are not hearsay and as such do not require the assistance of an exception to the hearsay rule in order to be admissible." *State v. Gomes*, 764 A.2d 125, 131 (R.I.2001) (quoting *In re Jean Marie W.*, 559 A.2d 625, 629 (R.I.1989)). "Absent a showing of abuse of discretion this [C]ourt will not overturn the trial justice's ruling on the admissibility of evidence." *State v. Stewart*, 663 A.2d 912, 924 (R.I.1995). However, "[t]his [C]ourt will affirm the orders and judgments of a trial court when the reasons given by the trial court are erroneous in circumstances in which there are other valid reasons to support the order or judgment appealed from." *Gross v. State, Division of Taxation*, 659 A.2d 670, 672 (R.I.1995) (citing *Ambeault v. Burrillville Racing Association*, 118 R.I. 310, 315, 373 A.2d 807, 809 (1977)). We hold that the trial justice erred in finding that the statement in-

---

22. Oliveira raised this issue and fully briefed it on appeal. The defendant Ferrell adopted Oliveira's argument, without comment, in his brief.

23. Rule 804(b)(5) of the Rhode Island Rules of Evidence provides in pertinent part that:

"The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
" * * *

"A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence."

volved herein was an exception to the hearsay rule.

However, we also conclude that she did not err by admitting the statement, as the statement was not hearsay, because it was not offered to prove the truth of the matter asserted. It was not offered to prove that if Evans had not testified in the Carpenter case, then Fisher would not have testified in the Baptista case. Instead, we infer that this statement was offered because it was probative of defendants' guilt: if Evans were to testify, defendants (and their friends, such as Fisher) knew that his testimony would be damaging to them. Accordingly, we conclude that the trial justice did not err by admitting the statement.

## IX

### The Motion for Acquittal

 The ninth argument presented for our review is that the trial justice erred by denying Ferrell's motion for judgment of acquittal on all counts of which he was convicted: conspiracy to murder Carpenter, assault with intent to murder Evans, and conspiracy to assault Evans.[24] "In considering a motion for judgment of acquittal, a trial justice must view the evidence in the light most favorable to the state, without weighing the evidence or assessing the credibility of the witnesses, in fact giving full credibility to the state's witnesses, and draw therefrom all reasonable inferences consistent with guilt. *State v. Mercado*, 635 A.2d 260, 263 (R.I. 1993); *State v. Laperche*, 617 A.2d 1371, 1373 (R.I.1992). If the totality of the evidence so viewed and the inferences so drawn would justify a reasonable juror in finding a defendant guilty beyond a reasonable doubt, the motion for judgment of acquittal must be denied. *Laperche,* 617 A.2d at 1373; *State v. Grundy,* 582 A.2d 1166, 1170 (R.I.1990); *State v. Caruolo,* 524 A.2d 575, 581–82 (R.I.1987). In reviewing a trial justice's denial of such a motion, this Court applies the same standard as the tribunal below. *Mercado,* 635 A.2d at 263." *State v. Snow,* 670 A.2d 239, 243 (R.I.1996).

 "[I]n a conspiracy situation, a criminal act by one partner in furtherance of the conspiracy may be attributed to all partners in the conspiracy without the necessity of a new agreement so long as the act could be reasonably foreseen as a necessary or natural consequence of the unlawful agreement." *State v. Romano,* 456 A.2d 746, 760 (R.I.1983) (citing *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946)). Additionally, this Court has stated that:

"The rule is well[-]established that where several persons combine or conspire to commit an unlawful act * * * each is criminally responsible for the acts of his associates or confederates in the furtherance of any prosecution of the common design for which they combine. Each is responsible for everything done by one or all of his confederates, in the execution of the common design, as one of its probable and natural consequences, even though the act was not a part of the original design or plan, or was even forbidden by one or more of them." *State v. Miller,* 52 R.I. 440, 445–46, 161 A. 222, 225 (1932).

The trial justice noted that Ferrell's liability "attach[ed] on the vicarious basis * * * by way of the crime of conspiracy." She reviewed the evidence in detail, noting:

---

24. Ferrell raised this issue and fully briefed it on appeal. The defendants McKinney and

Oliveira adopted his argument, without comment, in their respective briefs.

"The indictment charges all five defendants with conspiracy to commit the murder of John Carpenter and conspiracy to commit the crime of assault * * * with intent to murder Lorenzo Evans.

"The evidence has established that on that day, and the inferences that this evidence reasonably warrants, is that five men in two vehicles, with a minimum of four guns, were at the scene of Dexter and Division Street, that three men with guns followed the car onto Dexter Street, that two men, one of whom has been testified to as having a gun, a revolver, in his hand, that is, the defendant Ferrell, backed up his automobile back to the intersection of Division and Harrison, and laid in wait for Lorenzo Evans.

"Those facts, if believed by a jury, establish a chain of inferences [from] which a jury could find there was an agreement between those five persons to commit substantive offenses.

"Under our law, the gravamen of a criminal conspiracy is a common agreement between one or more persons to do an unlawful act. The Supreme Court has recognized that it is usually very difficult to prove in complete detail the explicit terms of an agreement. The existence of an agreement to enter into a criminal enterprise or to commit a criminal act can be established by inference, that is, the goals of the conspirators can be inferentially established by proof of the relations, conduct, circumstances and actions of the parties. Viewed in the light most favorable to the State, there are two cars on Division Street on December 18th, 1995, when the shooting starts. One car is the black Jeep which contains defendants Oliveira, [M]cKinney and Sanders. That Jeep turns the corner, enters onto Dexter Street. The white Taurus waits at the corner. Lorenzo Evans runs through the yards, comes out on the back street, which is Harrison Street, and that car has backed up and is face—and is laying in wait—its occupants, one with a gun, are laying in wait for Lorenzo Evans. That is a chain of events, if believed by a jury, that can substantiate an agreement between the parties.

"Under our law, once a conspiracy has been established, all members of the unlawful agreement are jointly and sever[al]ly liable for the acts of the conspirators."

Accordingly, because a reasonable juror could have found Ferrell guilty beyond a reasonable doubt of all three counts of which he was convicted on a theory of vicarious liability, we find that the trial justice did not err in refusing to acquit Ferrell. *See State v. Gatone*, 698 A.2d 230, 241 (R.I.1997) (" 'The agreement itself constitutes the crime, and the conspiracy is committed at the moment the agreement is struck.' "); *State v. Smith*, 662 A.2d 1171, 1177 (R.I.1995) ("Conspiracy is defined as 'a combination of two or more persons to commit an unlawful act or to perform a lawful act for an unlawful purpose.' "); *State v. Barton*, 427 A.2d 1311, 1313 (R.I. 1981) ("Although a common agreement is a keystone of any criminal conspiracy, it is difficult to prove the explicit terms of such an agreement. Consequently, the conspirators' goals may be inferentially established by proof of the relations, conduct, circumstances, and actions of the parties.") (citing *State v. Murphy*, 113 R.I. 565, 323 A.2d 561 (1974)); *Miller*, 52 R.I. at 445, 161 A. at 225 ("where several persons combine or conspire to commit an unlawful act * * * each is criminally responsible for the acts of his associates or confederates in the furtherance of any prosecution of the common design for which they combine").

## X

### Double Jeopardy

In the tenth argument on appeal, Ferrell argues that his sentence to consecutive terms on his two convictions for conspiracy is illegal and amounts to "double jeopardy."[25] In the instant case, the indictment charged two separate conspiracies. At sentencing, the trial justice imposed separate consecutive sentences on both charges, that is, ten years to serve on conspiracy to murder and ten years to serve on conspiracy to assault with intent to murder, both consecutive.

Rule 35 of the Superior Court Rules of Criminal Procedure provides in pertinent part that: "The court may correct a sentence imposed in an illegal manner and it may reduce any sentence within one hundred twenty (120) days after the sentence is imposed." This Court has repeatedly held that, in the absence of a motion and determination pursuant to Rule 35, we will not consider issues involving the legality or propriety of a sentence. *See State v. Morris,* 744 A.2d 850, 859 (R.I.2000); *Bettencourt,* 723 A.2d at 1114; *State v. Collins,* 679 A.2d 862, 867 (R.I. 1996); *State v. Brigham,* 638 A.2d 1043, 1046–47 (R.I.1994); *State v. Trepanier,* 600 A.2d 1311, 1315 (R.I.1991). Thus, we decline to consider the constitutionality of the sentence imposed upon him by the trial justice, until such time as Ferrell files a motion to correct or reduce that sentence pursuant to Rule 35.[26]

Moreover, "[p]ursuant to Rule 12(b)(2) [of the Superior Court Rules of Criminal Procedure],[27] the defense of double jeopardy is waived unless [a] defendant raises it by way of pretrial motion or [unless] the trial justice, in [her] discretion, permits an untimely but otherwise proper assertion of the defense." *State v. Thomas,* 654 A.2d 327, 330 (R.I.1995) (citing *State v. Lee,* 502 A.2d 332, 334 (R.I.1985); *State v. Sharbuno,* 120 R.I. 714, 722, 390 A.2d 915, 920 (1978)). In the instant case, Ferrell did not bring any concern over his possible conviction and sentencing on both counts before the trial justice's attention for her consideration. Consequently, Ferrell's failure to present a procedurally proper double jeopardy defense constitutes a waiver thereof under Rule 12(b)(2). As a result, the merits of Ferrell's claim cannot be reached.

## XI

### The Examination of Witnesses

The eleventh argument on appeal is that the trial justice erred by limiting the de-

---

25. Ferrell raised this issue and fully briefed it on appeal. The defendants McKinney and Oliveira adopted his argument, without comment, in their respective briefs.

26. According to the court file, Ferrell filed a Super.R.Crim.P. 35 motion on October 21, 1997. That motion was passed three times and, then, ultimately withdrawn.

27. Rule 12(b)(2) of the Superior Court Rules of Criminal Procedure provides in pertinent part:
 "The defense of double jeopardy and all other defenses and objections based on defects in the institution of the prosecution or in the indictment, information, or complaint other than that it fails to show jurisdiction in the court or to charge an offense may be raised only by motion before trial. The motion shall include all such defenses and objections then available to the defendant. Failure to present any such defense or objection as herein provided constitutes a waiver thereof, but the court for cause shown may grant relief from the waiver. Lack of jurisdiction or the failure of the indictment, information, or complaint to charge an offense shall be noticed by the court at any time during the pendency of the proceeding."

fense's examination of two witnesses: Ward and Evans.

## (A) Ward

██ Oliveira argues that the trial justice erred by not allowing him to elicit, on direct examination of Ward, that she was the then-girlfriend of Sanders and not of Oliveira, to show that she did not have the bias, interest, or motive to fabricate on behalf of Oliveira.[28] He argues that this was a violation of his right to explore a witness' bias or prejudice. The trial justice found that this was an attempt to rehabilitate someone who had not been impeached and declared the evidence to be irrelevant, as well as highly prejudicial to Sanders.

This Court repeatedly has stressed the importance that both the United States and Rhode Island Constitutions attach to a defendant's confrontation rights; but those protections "ensure that a criminal defendant has the right to confront those who testify *against* him or her at trial." *State v. Olsen*, 610 A.2d 1099, 1101 (R.I.1992) (emphasis added); *see also State v. Beaumier*, 480 A.2d 1367, 1372 (R.I.1984) ("the right of cross-examination is a primary interest secured by the confrontation clause, it being the principal means by which to test the truth and veracity of a witness's testimony"). They do not apply to a defendant's direct examination of a favorable witness.

██ Oliveira's attorney told the trial justice that he wanted the testimony to come in "under rules relative to relevance." "Relevant evidence is evidence that tends 'to make the existence of any fact that is of consequence to the determination of the action more probable or less

probable than it would be without the evidence.'" *State v. Tassone*, 749 A.2d 1112, 1117 (R.I.2000) (quoting R.I. R. Evid. 401). "Decisions about the admissibility of evidence on relevancy grounds are left to the sound discretion of the trial justice." *State v. Botelho*, 753 A.2d 343, 350 (R.I. 2000) (citing *State v. Evans*, 742 A.2d 715, 719 (R.I.1999)). Such rulings will not be disturbed on review, "absent a clear abuse of discretion that results in prejudice to the defendant." *Tassone*, 749 A.2d at 1117 (citing *State v. Gabriau*, 696 A.2d 290, 294 (R.I.1997)). In the instant case, we conclude that evidence that Ward may have been Sanders' girlfriend did not tend to make any more or less probable her claim that she was with Oliveira at the time of the murder. Accordingly, we conclude that the trial justice did not abuse her discretion in excluding that testimony.

## (B) Evans

On direct examination of Evans, the prosecutor asked Evans what Ferrell had done with the gun that Evans had seen in Ferrell's hand. Evans responded that, "[h]e didn't get a chance to point it at me, but * * *." At that point, the trial justice asked the prosecutor to move on. The defense, on cross-examination, attempted to challenge Evans' statement. Evans testified that: "I'm telling [the jurors] that [Ferrell] pulled the gun out, and if I would have stayed longer, he would have pointed it at me and he would have shot." Defense counsel immediately challenged this claim as foundationless and asked: "That's what you're assuming, correct?" The state objected to that question, and the trial justice sustained the state's objection. The de-

---

**28.** Oliveira raised this issue and fully briefed it on appeal. The defendant Ferrell adopted his argument, without comment, in his brief.

fense argues that in doing so the trial justice erred and impermissibly restricted cross-examination.[29]

██ "This Court has previously concluded that the exercise of discretion by the trial justice in limiting the scope of cross-examination will not be disturbed absent a clear abuse of that discretion." *State v. Feole*, 748 A.2d 239, 242 (R.I.2000) (quoting *State v. Walsh*, 731 A.2d 696, 698 (R.I.1999)). "Although 'a criminal defendant is constitutionally guaranteed the right to an effective cross-examination of the prosecution's witnesses * * * the scope of cross-examination is subject to limitation by the trial justice's exercise of his or her sound discretion.' " *Feole*, 748 A.2d at 242 (quoting *State v. Brown*, 709 A.2d 465, 473 (R.I.1998)). "We have further held that questions that 'are irrelevant or offer no probative value' surpass the legitimate limits of cross-examination." *Feole*, 748 A.2d at 242 (quoting *Bettencourt*, 723 A.2d at 1110). In the instant case, the record indicates that the cross-examination of Evans by Ferrell's attorney spanned more than forty pages. Moreover, each of his co-defendants conducted cross-examination of Evans and each conducted recross-examination. The fact that Ferrell argues on appeal that the trial justice's sustaining of an objection to a single question deprived him of even a minimum threshold inquiry into Evans's credibility and, thus, interfered with his constitutional right to challenge Evans's testimony, completely strains all credulity. Furthermore, the question at issue here was an argumentative one and well within the trial justice's discretion to preclude. Accordingly, the trial justice did not abuse her discretion in sustaining the prosecutor's objection.

## XII

### The Motion to Sever

The twelfth argument on appeal is that the trial justice erred when she denied Ferrell's motion to sever his case from that of co-defendants, Oliveira and Sanders. Ferrell argues that his conviction was a result of a "spillover effect" from some of the evidence against Oliveira and Sanders. Ferrell argues that the trial justice failed to grant him relief from prejudicial joinder under Rule 14 of the Superior Court Rules of Criminal Procedure.

██ Rule 14 provides in pertinent part that:

"If it appears that a defendant * * * is prejudiced by a joinder of offenses or of defendants in an indictment * * * or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires."

"This Court has long held that to be entitled to a severance from a co-defendant, a defendant must affirmatively demonstrate that he would otherwise suffer prejudice substantial enough to impinge on his right to a fair trial. *See State v. Vasquez*, 620 A.2d 1248, 1251 (R.I.1993). It is not sufficient for a defendant to simply contend that he might have had a better opportunity for an acquittal had he been tried separately, *United States v. Leonard*, 494 F.2d 955, 968 (D.C.Cir.1974); rather, a defendant must affirmatively demonstrate the existence of compelling prejudice against which the trial court could not afford protection. *See State v. Cassey*, 543 A.2d 670, 674 (R.I.1988)." *State v. Bustamante*, 756 A.2d 758, 767 (R.I.2000). Here, defendant has not identified any specific instances of prejudice that resulted from the denial of

---

**29.** Ferrell raised this issue and fully briefed it on appeal.

his motion to sever. Accordingly, defendant has failed to satisfy his burden of demonstrating that a compelling prejudice existed as a result of a joint trial or that such a trial actually prejudiced his defense. Therefore, we conclude that the trial justice appropriately exercised her discretion in denying defendant's motion to sever.

## XIII

### Due Process

The thirteenth argument on appeal is that Ferrell's conviction for assault with intent to murder Evans must be reversed because the jury may have convicted him without due process for a crime not proven, of which he had no notice, and as to which he had no opportunity to offer a defense. On appeal, Ferrell argues that it was possible that he was unconstitutionally convicted of the assault, not as a coconspirator "criminally responsible for the acts of his associates," but on testimony that he gestured "up and down" with a gun, which he now contends was not stated in the charge or argued at trial and which could not suffice to prove the offense.

 Due process requires that a party be given an "opportunity to be heard 'at a meaningful time and in a meaningful manner.' " *Millett v. Hoisting Engineers' Licensing Division of the Department of Labor,* 119 R.I. 285, 296, 377 A.2d 229, 236 (1977). In determining what process is due, the Court takes into account three factors: "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. El-*

*dridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33 (1976). Moreover, "it is the *opportunity* to exercise a right and not the actual implementation of that right that constitutes due process." *Fitch v. Department of Transportation, Division of Motor Vehicles,* 535 A.2d 314, 316 (R.I. 1988). (Emphasis added.) In addition, the right to be heard "is without meaning unless such notice of the pendency of a hearing or proceeding is adequate in the circumstances to safeguard the right." *Cugini v. Chiaradio,* 96 R.I. 120, 125, 189 A.2d 798, 801 (1963) (citing *Anderson National Bank v. Luckett,* 321 U.S. 233, 64 S.Ct. 599, 88 L.Ed. 692 (1944)).

 In the instant case, the jury was instructed that it could find Ferrell guilty of assault only if it found him guilty of the conspiracy to commit assault. The jury heeded the charge. Moreover, the jury could have found that Ferrell was acting as a lookout and predicated assault on that finding: that is, the fact that Ferrell waved a gun at Evans, putting Evans in such fear for his life that he ran, could have been used as the predicate for the assault conviction. *See State v. Baker,* 20 R.I. 275, 277, 38 A. 653, 654 (1897) ("An assault, as ordinarily defined, is any unlawful attempt or offer, with force or violence, to do a corporal hurt to another, whether from malice or wantonness. The offence may consist, also, in putting another in fear of violence."); *see also State v. McGranahan,* 415 A.2d 1298, 1303 (R.I. 1980) ("Malice can * * * be inferred from circumstances where there is disparity in size and strength between the victim and an assailant."). Thus, Ferrell's assault conviction was consistent with the indictment, the bill of particulars, the evidence at trial, the arguments of the prosecutor, and the charge to the jury. There was no failure of notice and no lack of opportunity

to mount a defense. Accordingly, there was no due process violation.

## XIV

### The Remarks of the Juror

 The fourteenth argument on appeal is brought by defendant McKinney. He argues that the trial justice erred when she failed to pass the case when one of the jurors, during the ninth day of the trial, made a comment in front of the other jurors that "they should just hang them all." McKinney notes that "[t]his comment was sufficiently prejudicial that the trial court at a minimum granted defense counsel's motion to strike the offending juror from the panel." On appeal, McKinney argues for the first time that, besides striking the juror, the court should have passed the case or at a minimum allowed defense counsel to *voir dire* the entire panel to determine whether these statements had infected the balance of the panel.

A review of the record reveals that McKinney's attorney did not request that relief. The only relief he sought (removal of the juror from the panel) was granted. "It is axiomatic that 'this [C]ourt will not consider an issue raised for the first time on appeal that was not properly presented before the trial court.' " *State v. Breen*, 767 A.2d 50, 57 (R.I.2001) (quoting *State v. Saluter*, 715 A.2d 1250, 1258 (R.I.1998)). In the instant case, "the trial justice committed no error since [s]he gave all the relief which was requested and cannot be faulted for failing to give relief by way of a mistrial in the absence of a request therefor." *State v. Gallagher*, 654 A.2d 1206, 1212 (R.I.1995) (citing *State v. Martinez*, 651 A.2d 1189, 1196–97 (R.I.1994); *State v. Rivera*, 640 A.2d 524, 526–27 (R.I.1994)).

## XV

### The Tattoo Evidence

The fifteenth argument on appeal is that the trial justice erred when she permitted the state to introduce a tattoo on defendant's arm as evidence of a motive for the murder of Carpenter.[30] McKinney argues that there was never any evidence, direct or circumstantial, that defendants had made any type of pact to avenge the death of Baptista. Thus, McKinney argues that it was prejudicial for the state to require him to be the focus of the jury's attention by standing up, taking off his blazer, rolling up his sleeve, and brandishing his arm. The prosecution argues that the fact that three of the five defendants acquired identical tattoos two days after Baptista's murder was circumstantial evidence of that very pact.

 All evidence tending to prove guilt in a criminal trial is prejudicial to a defendant. *See State v. Lemon*, 497 A.2d 713, 720 (R.I.1985). "[N]o doctrine in the law * * * is designed to insulate [a] defendant from relevant truths[,]" *State v. Young*, 743 A.2d 1032, 1036 (R.I.2000) (quoting *State v. Burke*, 529 A.2d 621, 628 (R.I.1987)), "even if such truths might lead the jury to draw less favorable inferences concerning defendant than if they were not exposed." *Burke*, 529 A.2d at 628 (quoting *Cline*, 122 R.I. at 331, 405 A.2d at 1210). "The ultimate determination of the effect of evidence lies in the discretion of the trial justice." *State v. Aponte*, 649 A.2d 219, 223 (R.I.1994) (citing *State v. Grundy*, 582 A.2d 1166, 1172 (R.I.1990)). This Court reviews relevancy and prejudice determinations for prejudicial abuse of discretion. *See State v. Sabetta*, 680 A.2d 927, 934 (R.I.1996); *State v. Clark*, 576 A.2d 1202, 1205 (R.I.1990); *State v. Alger*,

---

**30.** McKinney raised this issue and fully briefed it on appeal.

545 A.2d 504, 507 (R.I.1988). The fact that three of the five defendants acquired identical tattoos (that is, tattoos on their right arms of the name "Pearl," a cross, the date of Baptista's death, "12/15/95," and the acronym, "RIP") a mere two days after Baptista's murder could be circumstantial evidence of a pact among defendants to avenge the death of Baptista. Therefore, we conclude that the trial justice did not abuse her discretion by requiring defendant McKinney to show his tattoo to the jury.

## XVI

### The Letter

 The final argument on appeal is that the admission of a letter allegedly written by McKinney was erroneous because the state was never able to establish its authenticity.[31] The state made an offer of proof that the letter was handed by McKinney to another inmate at the ACI, Reginald Young (Young), on January 17, 1996, with the instruction to take it to Ferrell, and that, before he was able to deliver the letter, Young was stopped by an ACI guard and routinely searched, whereupon the letter was found and seized as contraband. The state further informed the court that Young had told members of the ACI investigative unit and Providence Police Det. Robert Clements how he came into possession of the letter. McKinney's main argument at trial was that the letter had not been properly authenticated because it had not been established that the handwriting was McKinney's. McKinney argued that the state's attempt to link the letter to him was merely through chain of custody (that is, that at one point McKinney had the letter in his hand) and that was insufficient to authenticate the letter.

The trial justice provisionally ruled that there was "a sufficient nexus of authentication between this letter and this defendant to warrant its admissibility." She further stated that she would instruct the jury that before its members could consider the letter against McKinney, "they must, in fact, be satisfied that he is, in fact, the author." The state then presented Young as a witness. Young testified that at approximately 12:30 p.m. on January 17, 1996, McKinney gave him a letter and asked him to "pass it to the Ferrell kid." Young also identified McKinney in court. Young testified that he put the letter in his pocket. When he went upstairs, a corrections officer patted him down and found the letter and asked him where he got it. Young testified that he had not read the letter.

The state then presented Michael Moskaluk, the corrections officer who had seized the letter from Young, and Joseph Forgue, a special investigator for the Department of Corrections, who described how he had obtained the letter. When the state moved to admit the letter, McKinney objected on two grounds: hearsay and lack of authentication. The trial justice ruled that she was "satisfied that Rule 901 ha[d] been more than met by the testimony of Reginald Young, as well as [that] the references in the letter itself [were] indicative of the client's authorship." McKinney later took the stand and admitted writing the letter.

 We previously have held that "document authenticity need not be established by any particular means * * * [but] may be accomplished by any of the methods enumerated in Rule 901 or 902." *Superior Boiler Works, Inc. v. R.J. Sanders, Inc.,* 711 A.2d 628, 632 n. 3 (R.I.1998). Rule 901(b)(1) of the Rhode Island Rules

---

**31.** McKinney raised this issue and fully briefed it on appeal.

of Evidence provides that one way to authenticate a document is through testimony by a witness with knowledge "that a matter is what it is claimed to be." "In making Rule 901 determinations, trial justices must decide whether there is enough support in the record to conclude that it is 'reasonably probable' that the evidence is what its offeror claims it to be. * * * If so, then the evidence's suasive force is for the jury to decide." *State v. Griffin*, 691 A.2d 556, 558 (R.I.1997). In the instant case, the state produced testimony by Young that McKinney handed him the letter and directed him to pass it to Ferrell who was then at the ACI. In addition, the letter itself contained many details personal to McKinney, including that his son's first birthday was approaching, that his girlfriend was four months pregnant, and that he was then serving six months for a probation violation. Accordingly, the trial justice did not abuse her discretion by admitting the letter. *See id.* (noting that this Court reviews 901 rulings for abuse of discretion).

As for McKinney's argument that the trial justice's ruling to admit the letter affected his decision to testify—that is, if the evidence had not been admitted "he would never have waived his 5th Amendment right against self incrimination to refute the interpretation, given to it by the prosecutor[,]"—this Court has previously rejected such an argument. "It must be borne in mind that defendant's decision not to testify in respect to any of the charges was his own tactical decision and was certainly not reached by virtue of any prohibition or preclusion placed on him by the trial justice or the prosecution." *State v. Lassor*, 555 A.2d 339, 347 (R.I.1989). This argument likewise must be dismissed as groundless.

### Conclusion

For the reasons stated, the defendants' appeals are denied and the judgments of conviction are affirmed.

Justice GOLDBERG did not participate.